**Barbara MITCHELL and Gregory Mitchell, Plaintiffs–Appellants,**

v.

**COLLAGEN CORPORATION, Defendant–Appellee.**

**No. 94–3946.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 13, 1996.

Decided Sept. 23, 1997.

David Cerven, Joseph E. Costanza, Sr., Burke, Murphy, Costanza & Cuppy, East Chicago, IN, Michael M. Essmyer, Essmyer & Tritico, Houston, TX, Clinard Hanby, The Woodlands, TX, Brian Wolfman (argued), Public Citizen Litigation Group, Washington, DC, for Plaintiff–Appellant.

Gregory J. Tonner, Jon F. Schmoll, Spangler, Jennings & Dougherty, Merrillville, IN, Keith A. Jones, Joe W. Redden, Jr. (argued), Beck, Redden & Secrest, Houston, TX, Robert Neil Weiner, Steve J. Boom, Arnold & Porter, Washington, DC, Hugh Young, Product Liability Advisory Counsil, Inc., Reston, VA, for Amicus Curiae.

Before CUDAHY, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

This case is before the court on remand from the Supreme Court of the United States. The Court has directed us to reconsider our earlier decision in light of the Court's intervening decision in *Medtronic, Inc. v. Lohr*, ——— U.S. ———, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). *See Mitchell v. Collagen Corp.*, ——— U.S. ———, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996) (granting certiorari, vacating our judgment and remanding for consideration in light of *Medtronic*).

In their complaint, the Mitchells alleged various state law claims arising out of collagen-based injection treatments that Mrs.

Mitchell received. Collagen Corporation ("Collagen") sought summary judgment, on the ground that all the Mitchells' claims were preempted by the Medical Devices Amendments ("MDA"), 21 U.S.C. §§ 360c et seq., to the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 et seq. The district court granted summary judgment to Collagen on the ground that the state law claims were preempted. See Mitchell v. Collagen, 870 F.Supp. 885 (N.D.Ind.1994). We affirmed the grant of summary judgment, relying, with respect to some of the claims, on Collagen's defense of preemption and, with respect to other claims, on the Mitchells' failure to meet their burden of coming forward on summary judgment with an adequate factual showing to warrant trial. See Mitchell v. Collagen Corp., 67 F.3d 1268 (7th Cir.1995) ("Mitchell I"). After reconsidering this case in light of the Supreme Court's Medtronic analysis, we affirm the judgment of the district court.

## I

### BACKGROUND

#### A. Facts

We shall assume familiarity with the facts set out in Mitchell I. We limit our rendition here to those matters relevant to the task at hand.

In 1988, Barbara Mitchell received several injections of Zyderm or Zyplast (collectively "Zyderm"), collagen-based products produced by Collagen. Zyderm is used to fill in soft tissue under skin or scars when tissue has been lost due to injury, trauma, age, infection or other diseases. The collagen-based product is injected into the layers of the skin where there is a depressed scar or indentation. Zyderm acts as a replacement for the soft tissue that has been lost in this area and is classified as a Class III medical device.

Class III medical devices are those that operate "to sustain human life, are of substantial importance in preventing impairment of human health, or pose a potential unreasonable risk of illness or injury." Chambers v. Osteonics Corp., 109 F.3d 1243, 1245 (7th Cir.1997). Before a Class III device may be introduced to the market, the manufacturer must provide the Food and Drug Administration ("FDA") with a reasonable assurance that the device is safe and effective under the MDA. Medtronic, ── U.S. at ──, 116 S.Ct. at 2246. To provide that assurance, a manufacturer must obtain premarket approval ("PMA") from the FDA. This procedure is a "rigorous" process, in which the manufacturer much submit detailed information to the FDA regarding the safety and effectiveness of the device. Id. at ──, 116 S.Ct. at 2247. Manufacturers must provide the FDA with samples of the device, an outline of the device's components and properties, a description of the manufacturing process, copies of the proposed labels, various other data and information, and any other information the FDA requests. 21 C.F.R. § 814.20. The FDA spends an average of 1,200 hours per PMA application reviewing these materials.

The FDA initially approved Collagen's PMA for Zyderm in 1981. During 1991–92, the FDA conducted a reexamination of Zyderm and concluded that its decision to approve Zyderm's PMA was appropriate.

There are several exceptions to the PMA requirement. These exceptions have demonstrated a propensity for swallowing the rule. See Medtronic, ── U.S. at ────────, 116 S.Ct. at 2247–48 (cataloging the lopsidedness of Class III devices introduced under the "substantially equivalent" procedures rather than under the PMA process). First, products that were introduced into or distributed to be introduced into interstate commerce prior to May 28, 1976 are grandfathered from this requirement until the FDA initiates and completes the PMA process for such devices. 21 C.F.R. § 814.1(c)(1). Second, those devices that are "substantially equivalent" to grandfathered products are exempt from the PMA process until the FDA initiates and completes the PMA process for such products. Id. In stark contrast to the PMA process, the FDA determination of whether a Class III device is substantially equivalent to another device already on the market is completed, on average, in only 20 hours. Medtronic, ── U.S. at ──, 116 S.Ct. at 2247.

#### B. Earlier Proceedings

##### 1.

The Mitchells filed a multi-count complaint against Collagen in Indiana state court.

Their complaint alleged counts of strict liability, negligence, fraud, mislabeling, misbranding, adulteration and breach of warranty. Collagen removed the case to federal court and moved for summary judgment. The district court granted Collagen's motion. It reasoned that the Mitchells' state law claims were preempted by the MDA. The court determined the scope of federal preemption by focusing on the MDA's preemption provision and the FDA's regulations. The MDA proscribes states from establishing "any requirement ... which is different from, or in addition to, any [federal] requirement" established under the MDA. 21 U.S.C. § 360k(a).[1] The regulations clarify that a state requirement can include requirements established by court decision. *See* 21 C.F.R. § 808.1(b). The district court concluded that Congress intended the MDA preemption provision to be read to preempt common law causes of action. It reasoned that the PMA process for Class III medical devices constitutes a requirement under the MDA and that, consequently, any state requirement that implicated the requirements imposed by the PMA process was a requirement "different from, or in addition to," the federal requirements. The district court therefore granted Collagen's motion and dismissed all the state law counts as preempted by federal law, except for Mr. Mitchell's derivative claim for loss of consortium. This claim was dismissed because the remaining claims were preempted.

## 2.

We affirmed the judgment of the district court, although we did not rely exclusively on preemption grounds. We began by noting that the question of whether a state cause of action is preempted by federal law " 'is a question of congressional intent.' " *Mitchell I*, 67 F.3d at 1274 (quoting *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252, 114 S.Ct. 2239, 2243–44, 129 L.Ed.2d 203 (1994)). Relying primarily on the plain wording and language of the MDA preemption clause, we concluded that "[t]he phrase 'any requirement' in 21 U.S.C. § 360k(a) is broad enough to include at least some common law causes of action within the statute's preemptive scope." *Id.* at 1276; *cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (holding that state requirement under Public Health Cigarette Smoking Act of 1969 preemption provision encompasses common law causes of action). In considering the FDA's preemption regulations under the MDA and the structure of the Amendments, we also concluded that the PMA process constitutes a specific federal requirement for preemption purposes under 21 U.S.C. § 360k(a).

We then turned to the individual claims and analyzed them in light of these conclusions to determine whether they would add requirements "different from, or in addition to," the PMA process. First, we dealt with the Mitchells' strict liability claim and their negligence claims. The strict liability claim alleged that Collagen "knew or in the course of reasonable care should have known" that Zyderm was "unreasonably dangerous and had the potential for causing serious immunological and/or autoimmune reactions, damage and injuries when injected into humans for its intended use and purpose." Compl. at 2–3. The negligence claims alleged that the

---

1. Section 360k(a) provides:
 Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
 (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
 (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The pertinent FDA regulation provides:
 State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements.

21 C.F.R. § 808.1(d).

product was accompanied by inadequate warnings and that Collagen had been negligent in the design, testing, approval, manufacturing, marketing and sale of Zyderm. We held that these claims were preempted by the MDA. We further concluded that, to the extent that the mislabeling, misbranding and adulteration claims alleged violations of state law despite Collagen's conformity to the FDA's requirements, these claims also were preempted. However, to the extent that the Mitchells' claims for mislabeling, misbranding and adulteration alleged that Collagen had not followed the FDA requirements, the claims were not preempted because, in permitting a cause of action for non-conformity with federal requirements, state law did not impose a requirement "different from, or in addition to," the federal requirements.

Upon examination of the Mitchells' mislabeling, misbranding and adulteration claims, however, we determined that only the Mitchells' adulteration claim could be construed as falling into this non-preempted category, and that claim, we concluded, could not survive the motion for summary judgment because the Mitchells had failed to present sufficient evidence. We agreed with the district court that the Mitchells' claims of Collagen's fraud on the FDA and of implied warranty were also preempted. Finally, we determined that, although one possible fraud claim and the express warranty claims would not be preempted by the MDA, Collagen was still entitled to summary judgment on these claims because the Mitchells had not come forward with sufficient evidence to defeat the summary judgment motion.

We therefore affirmed the judgment of the district court dismissing all of the Mitchells' claims. The Mitchells then filed a petition for certiorari in the Supreme Court. The Court granted that petition, vacated our earlier decision, and invited us to reconsider the Mitchells' claims in light of its decision in *Medtronic v. Lohr*, —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

## II

## DISCUSSION

### A.

We begin our analysis by turning to the decision of the Supreme Court in *Medtronic*.

At the outset, we think it is important to stress that the factual situation before the Court in *Medtronic* was substantially different from the one before us today. In *Medtronic*, the Supreme Court dealt with the scope of the preemption provision of the MDA in the context of the expedited "substantially equivalent" process, not the full PMA process to which the Collagen product was subjected.

*Medtronic* involved a malfunctioning pacemaker. Lora Lohr and her husband filed their action against *Medtronic* after Ms. Lohr's pacemaker, a Class III medical device, malfunctioned. As we have just noted, the pacemaker had not gone through the PMA process, but was allowed to be marketed because the FDA determined that it was substantially equivalent to a device already on the market. The Lohrs' complaint alleged a number of counts of negligence and strict liability. The Court of Appeals for the Eleventh Circuit determined that the MDA preempted at least some common law actions. It held that the non-design claims were preempted because the FDA's good manufacturing and labeling regulations establish preemptive federal requirements. The court also held that the negligent and strict liability design claims were not preempted because the "substantially equivalent" determination was not a decision with respect to the pacemaker's safety.

The Supreme Court reversed with respect to the preempted claims. The majority began by noting that the MDA contains a provision that expressly preempts state law. *Medtronic*, —— U.S. at ——, 116 S.Ct. at 2250. Therefore, continued the Court, the task was not to determine whether state law is preempted by the MDA but rather to determine the degree to which state law is preempted. Its task defined, the Court began its analysis by recalling two basic principles that traditionally govern preemption analysis. It first recalled that, "because the States are independent sovereigns in our federal system, ... Congress does not cavalierly pre-empt state-law causes of action." *Id.* Next, it noted that the purpose of Congress is the "ultimate touchstone in every preemp-

tion case." *Id.* (quotation and citation omitted).

At this point, there was disagreement among the Justices with respect to the appropriate analysis. Justice Stevens, writing for himself and three other Justices, rejected Medtronic's assertion that the preemption provision of the statute, 21 U.S.C. § 360k(a), *see* note 1, *supra*, preempted any common law cause of action because such a cause of action is a "requirement." These Justices found such an assertion to be "implausible." —— U.S. at ——, 116 S.Ct. at 2251. In their view, because the federal act does not provide for a private cause of action, Medtronic's construction of the preemption statute would "have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order 'to provide for the safety and effectiveness of medical devices intended for human use.'" *Id.* (quoting Pub.L. No. 94–295, 90 Stat. 539 (preamble to the Act)). These Justices continued that it was difficult to believe that Congress would have removed all avenues of legal redress without significant discussion. The use of the term "requirement," the Justices continued, suggests a focus on "device-specific enactments of positive law by legislative or administrative bodies, not the application of general rules of common law by judges and juries." *Id.* at ——, 116 S.Ct. at 2252. Moreover, remarked these Justices, there is no indication in the history of the Act that the drafters feared that the operation of the state common law system would frustrate the purposes of the Act to protect the consumer of medical goods without unduly frustrating innovation.

A contrary view with respect to the preemptive effect of the MDA on state common law causes of action was expressed by Justice O'Connor in an opinion joined by three other Justices. In the view of these members of the Court, a common law duty was a "requirement" within the meaning of the MDA because common law causes of action "operate to require manufacturers to comply with common-law duties." *Id.* at ——, 116 S.Ct. at 2262 (O'Connor, J., concurring in part and dissenting in part). Therefore, concluded the Justices, a fair reading of the statute "indicates that state common-law claims are preempted ... to the extent that their recognition would impose 'any requirement' different from, or in addition to, FDCA requirements applicable to the device." *Id.* at ——, 116 S.Ct. at 2263 (O'Connor, J., concurring in part and dissenting in part). Unlike the Justices joining Justice Stevens' opinion, these members of the Court did not believe that the state common law had to be "specific" to be preempted. It simply had to be "different from, or in addition to," any requirement of federal law. Turning to the case before them, these same Justices therefore concluded that the Lohrs' defective design claim was not preempted by the substantial equivalency process. This process, pointed out Justice O'Connor, merely determines whether the device in question is the substantial equivalent of another device already on the market. It places no "requirement" on the device. Nor did these Justices believe that any cause of action based on a failure to comply with federal requirements was preempted because enforcement of a federal requirement is not a requirement that is "different from, or in addition to," the requirements imposed by federal law. Moreover, the Justices continued, the availability of a damages remedy does not interfere with the federal scheme. The statute forbids imposing an additional requirement, not an additional remedy. However, these Justices continued, some of the Lohrs' manufacturing and labeling claims would compel Medtronic to comply with requirements "different from, or in addition to," those required by the FDA and thus would be preempted. Similarly, the Lohrs' failure to warn claim was preempted because the FDA has set forth extensive and exclusive requirements in this area.

With eight of the Justices evenly divided into the two camps described above, the separate views of Justice Breyer supplied the determining vote in establishing the Court's holding. On the crucial issue of whether the MDA could ever preempt a state common law cause of action, the Justice found himself in basic agreement with Justice O'Connor: "One can reasonably read the word 'requirement' as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law." *Id.* at

——, 116 S.Ct. at 2259 (Breyer, J., concurring). To illustrate his conclusion, the Justice posited a situation in which an MDA regulation required that a hearing aid contain a 1–inch wire, but a state regulation required a 2–inch wire. That MDA regulation would preempt the state regulation. The same result ought to obtain, reasoned Justice Breyer, if a state tort action were to impose liability on the failure to have a 2–inch wire. Consequently, wrote the Justice, "insofar as the MDA pre-empts a state requirement embodied in a state statute, rule, regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." *Id.* at ——, 116 S.Ct. at 2260 (Breyer, J., concurring). In determining whether the state tort actions before him were preempted, the Justice noted that, given the broad, highly ambiguous language of the statute, "Congress must have intended that courts look elsewhere for help as to just which federal requirements pre-empt just which state requirements, as well as just how they might do so." *Id.* (Breyer, J., concurring). The "elsewhere" to which the Justice referred was "the relevant administrative agency" with its "rules, regulations, or other administrative actions." *Id.* (Breyer, J., concurring). Focusing on the FDA's regulations, the Justice then noted that the FDA, by regulation, had provided that state requirements were preempted only when " '*specific* [federal] requirements applicable to a particular device' made 'any existing *divergent* State . . . requirements applicable to the device different from, or in addition to, the *specific* [federal] requirements.' " *Id.* at —— – ——, 116 S.Ct. at 2260–61 (Breyer, J., concurring) (quoting 21 C.F.R. § 808.1(d) (1995)) (brackets, ellipsis and emphasis in original).

The Court then turned to a disposition of the particular claims before it. Despite the differences outlined above, the unanimous Court rejected Medtronic's argument that the "substantially equivalent" determination by the FDA preempted the state claims based on defective design:

> There is no suggestion in either the statutory scheme or the legislative history that the § 510(k) exemption process was in-

tended to do anything other than maintain the status quo[, which] . . . included the possibility that the manufacturer of the device would have to defend itself against state-law claims of negligent design.

*Medtronic,* —— U.S. at —— – ——, 116 S.Ct. at 2254–55. Keeping in mind that congressional purpose is the touchstone of preemption analysis, the Court concluded that, given the background of the § 510(k) process and the presumption against preemption, the design claims were not preempted.

The unanimous Court also held that, to the extent a common law action mirrors the FDA regulations, it would not be preempted. Nothing in the MDA, held the Court, denies the state "the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at ——, 116 S.Ct. at 2255. Additional state requirements that would make the federal requirement narrower, not broader, might be different from the federal regulations in the literal sense but provide no reason to infer that Congress intended preemption. The addition of a damages remedy likewise does not create a preemption situation. It merely provides an additional reason for the manufacturer to comply with the federal regulations.

The views of the Justices joining in Justice Stevens' opinion and the views of Justice Breyer permitted the Court to form a majority for the disposition of the manufacturing and labeling claims. The FDA regulations provide that state requirements are preempted only when the FDA has established " 'specific counterpart regulations or . . . other specific requirements applicable to a particular device.' 21 C.F.R. § 808.1(d) (1995)." —— U.S. at ——, 116 S.Ct. at 2257 (ellipsis in original). Furthermore, preemption is not intended when the state requirements are "of general applicability where the purpose of the requirement relates either to other products in addition to devices . . . or to unfair trade practices in which the requirements are not limited to devices." 21 C.F.R. § 808.1(d)(1). Although the Court specifically did not conclude that "general" federal requirements could never preempt state requirements or that "general" state

requirements could never be preempted by federal requirements, the Court discerned an

> overarching concern that pre-emption occur only where a particular state requirement threatens to interfere with a specific federal interest. . . . The statute and regulations, therefore, require a careful comparison between the allegedly preempting federal requirement and the allegedly preempted state requirement to determine whether they fall within the intended preemptive scope of the statute and regulations.

—— U.S. at ——–——, 116 S.Ct. at 2257–58 (footnote omitted). When performing this comparison, courts are to be mindful that state requirements of general applicability are not preempted unless they establish a substantive requirement for a specific device and that the federal requirements, to be preemptive, must be specific to a particular device. *Id.*

Applying these principles, a majority of the Court found none of the Lohrs' claims to be preempted because of their generality and because of the generic nature of the federal requirements at issue there. In summarizing, the Court wrote:

> The generality of [the requirements at issue] make this quite unlike a case in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers. Rather, the federal requirements reflect important but entirely generic concerns about device regulation generally, not the sort of concerns regarding a specific device or field of device regulation which the statute or regulations were designed to protect from potentially contradictory state requirements.
>
> Similarly, the general state common-law requirements in this case were not specifically developed "with respect to" medical devices. Accordingly, they are not the kinds of requirements that Congress and the FDA feared would impede the ability of federal regulators to implement and enforce specific federal requirements. The

legal duty that is the predicate for the Lohrs' negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products. Similarly, the predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations. . . . These state requirements therefore escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that § 360k envisioned to be "with respect to" specific devices such as pacemakers.

*Medtronic,* —— U.S. at ——, 116 S.Ct. at 2258.

This case presents a difficult situation for an intermediate appellate court. The basic issue of statutory construction presented by the case is, as the Supreme Court noted in *Medtronic,* a difficult one. The implementing regulation of the FDA is likewise imprecise and fails to address squarely the issue of preemption by common law causes of action. Lastly, although we have an obligation to be absolutely faithful to the holdings of the Supreme Court of the United States, the holding in *Medtronic* contains several ambiguities that impair our ability to perceive with absolute clarity the path that the Court has chosen for us to follow.

The ambiguity central to our task is the tension between the holding of the Court embodied in the text immediately above and Justice Breyer's belief, essential to the formation of a majority, that at least some state-based causes of action would be preempted by the MDA. Like the majority of courts that already have had to deal with this quandary, we believe that the *Medtronic* disposition must be read as acknowledging that at least some state-based common law causes of action must be considered "requirements" as that term is employed in the MDA. Before we address, with more specificity, this ambiguity, which is central to our

decision, we must pause to address a threshold matter that is also very important to our analysis and that, both analytically and as a matter of prudent presentation, must be confronted first.

## B.

■ As we have noted once already, the PMA process to which Zyderm was subjected in this case is substantially different from the "substantially equivalent" process at issue in *Medtronic.* Although there is some authority to the contrary,[2] we believe that the PMA process constitutes a specific federal regulation of the product.[3] The Supreme Court of Rhode Island, in *Fry v. Allergan Medical Optics,* 695 A.2d 511 (R.I.1997), faced this question in a case involving an intraocular lens and dealt with it with exceptional clarity. In determining that the PMA process was a specific federal regulation, as that term is employed in *Medtronic,* the court noted that the PMA process "involved a review of all the ingredients, components, manufacturing methods, and labeling to be used in conjunction with the lens." *Id.* at 516. The court concluded:

> We think rather than expressing entirely generic concerns of safety, the FDA has expressed explicit concerns toward this lens. We conclude that the premarket approval process constitutes a specific federal interest as contemplated in *Medtronic* and that, therefore, the FDA approval served to impose strict FDA requirements upon the defendant.

*Id.*

Dealing with the same product as the one now before us, the California Court of Appeal, in *Steele v. Collagen Corp.,* 54 Cal. App.4th 1474, 63 Cal.Rptr.2d 879, 887 (Ct. App.1997), held that the PMA procedure did amount to a specific regulation of Zyderm. The court contrasted the PMA process and the "substantially equivalent" process at issue in *Medtronic.* It emphasized that the

PMA process imposed requirements that directly affected the safety and effectiveness of the product. Indeed, although the design and labeling of the product might be changed without prior FDA approval to improve its safety or effectiveness, the product is subject to withdrawal from the market if the FDA determines that the changes have rendered the product unsafe or inadequate.

We agree that the PMA process, as opposed to the "substantially equivalent" process at issue in *Medtronic,* can constitute the sort of specific federal regulation of a product that can have preemptive effect. During the PMA process, the federal government, it can truly be said, has " 'weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers.' " *Papike v. Tambrands, Inc.,* 107 F.3d 737, 741 (9th Cir. 1997) (quoting *Medtronic,* —— U.S. at ——, 116 S.Ct. at 2258), *cert. denied,* —— U.S. ——, 118 S.Ct. 166, —— L.Ed.2d —— (1997).

## C.

■ We are now to the point at which we can return to the ambiguity created by the tension between Part V of the majority's opinion in *Medtronic* and the separate but essential views expressed by Justice Breyer. Here the path already has been cleared, at least partially, by our colleagues on another panel of this court. In *Chambers v. Osteonics Corp.,* 109 F.3d 1243 (7th Cir.1997), Judge Rovner, then dealing with a medical device approved under the "investigational device exception" (IDE) for Class III devices, examined the effect of a state court judgment to determine whether the maintenance of a par-

**2.** *See Sowell v. Bausch & Lomb, Inc.,* 230 A.D.2d 77, 656 N.Y.S.2d 16, 20–21 (N.Y.App.Div.1997) (holding that the PMA process is not a specific regulation because the requirements are not contained in a formal regulation); *see also Lakie v. SmithKline Beecham,* 965 F.Supp. 49, 53–54 (D.D.C.1997) (holding, without extensive discussion, that the PMA process is not a specific federal requirement).

**3.** For an excellent description of the PMA process, *see Martin v. Telectronics Pacing Sys., Inc.,* 105 F.3d 1090, 1095–96 (6th Cir.1997), *pet'n for cert. filed,* 65 U.S.L.W. 3755 (U.S. May 1, 1997) (No. 96–1749).

ticular common law cause of action would result in the frustration of the FDA's requirements. Writing for the court, she held that state common law claims for strict liability and implied warranty of merchantability would impose greater burdens on the manufacturer than those imposed by the FDA and therefore were preempted. On the other hand, a negligent manufacturing claim that simply alleged that the manufacturer had not complied with the requirements of the FDA did not impose state requirements that were different from or in addition to those imposed by the FDA and therefore was not preempted. This court's approach in *Chambers*, although dealing with a different aspect of the MDA from the one before us, is a significant analytical pathfinder because it recognizes that, in order to determine whether a common law cause of action is preempted by the action of the FDA, it is necessary to examine the state law cause of action at a sufficiently precise level of generality to determine whether the final judgment of the state court would impose on the manufacturer a burden incompatible with the requirements imposed by the FDA.

In adopting this analysis, Judge Rovner distinguished the decision of our colleagues in the Sixth Circuit in *Martin v. Telectronics Pacing Systems, Inc.*, 105 F.3d 1090 (6th Cir.1997), on the ground that the Ohio statutory claims involved in that litigation would have imposed on the manufacturer requirements greater than those imposed by the FDA. Notably, however, although our courts differ with respect to the result required in the particular case, they do not differ with respect to essential analysis. Judge Kennedy, writing for the Sixth Circuit, employed the same approach that Judge Rovner applied in our circuit. She examined the state statute, which admittedly applied on its face to products other than the medical device in question, and held that it was preempted because "it is the kind of require-

ment that would impede the implementation and enforcement of specific federal requirements." *Martin*, 105 F.3d at 1099.

The approach that this circuit and the Sixth Circuit have taken in determining whether state common law causes of action are preempted by the MDA is also the approach of the Ninth Circuit. In *Papike*, the court addressed specifically the difficulty caused by a comparison of the language in Justice Breyer's separate opinion and Part V of the majority opinion which the Justice also joined. The court concluded that

it makes little sense to argue that Justice Breyer would write separately to make clear his position that duties arising under state common law can constitute state law "requirements" which can be preempted by the MDA, and then agree that because tort law consists of generally applicable principles, it is always preempted, even in the face of specific federal requirements.

*Papike*, 107 F.3d at 742.[4] Other courts, faced with the same dilemma, have reached the same common-sense conclusion. *See, e.g., Chmielewski v. Stryker Sales Corp.*, 966 F.Supp. 839, 842–43 (D.Minn.1997). In *Fry v. Allergan Medical Optics*, 695 A.2d 511 (R.I.1997), for example, the Supreme Court of Rhode Island held that state claims based on theories of negligence, strict liability and breach of warranty, "insofar as these claims threaten to impose different or additional burdens on the defendant," *id.* at 517, are preempted. Had the plaintiff's state law claims alleged a departure from the FDA-imposed standards, said the court, those claims would not be preempted because "they would not impose different or additional requirements but would instead merely enforce the exact requirements imposed by federal law." *Id.* In a case that involved the same product as the one in this case, the California Court of Appeal, disagreeing with an earlier case from another district, *Arm-*

4. Our colleagues in the Tenth Circuit appear to have deviated from this general approach and require that the state "requirement" be developed specifically "with respect to" the medical device. It appears that the Tenth Circuit would hold therefore that generic common law causes of action do not meet this test because, when stated without application to a particular product, they cannot be said to have been de-

veloped "in relation to" the medical device in question. *See Oja v. Howmedica, Inc.*, 111 F.3d 782 (10th Cir.1997) (holding that, in a case involving a Class II medical device, state common law claims for negligent failure to warn and negligence in manufacture were not state requirements developed "with respect to" medical devices and therefore not preempted under *Medtronic*).

*strong v. Optical Radiation Corp.,* 50 Cal. App.4th 580, 57 Cal.Rptr.2d 763 (Ct.App. 1996),[5] decided that "state requirements in the form of standards of care or behavior are preempted and cannot form the basis of a state common law claim for damages if they are different from or in addition to the specific federal requirements arising from the PMA process." *Steele v. Collagen Corp.,* 54 Cal.App.4th 1474, 63 Cal.Rptr.2d 879, 888 (Ct.App.1997). The Florida District Court of Appeal, ruling in *Hernandez v. Coopervision, Inc.,* 691 So.2d 639 (Fla.Dist.Ct.App.1997), also employed a methodology that is faithful to the mandate of *Medtronic.* The party claiming preemption, ruled the court, must demonstrate that "there is a conflict between the state and federal regulations of the medical devices which threatens to interfere with a specific federal interest." *Id.* at 641.

The Pennsylvania Supreme Court, in *Green v. Dolsky,* 546 Pa. 400, 685 A.2d 110 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997), also recognized the fundamental difference between "substantially equivalent" cases such as *Medtronic* and PMA cases. It acknowledged that state common law causes of action could frustrate the congressional intent with respect to the MDA just as readily as other state regulatory devices. Although we have no need in this case to comment on all the Pennsylvania court's determinations of what is preempted and what is not preempted, it is noteworthy that it articulated several basic corollaries that are helpful. The court determined that (1) state claims that allege that FDA requirements have not been observed are not preempted, and (2) state claims that conflict with specific requirements of the FDA are preempted. The court specifically noted that state common law claims are preempted if they attempt to substitute a reasonableness analysis, characteristic of negligence claims, for the judgment of the FDA in approving the development and distribution of this par-

ticular product in the course of the premarket approval process. *Green,* 685 A.2d at 117.

**D.**

We now turn to the case before us and reevaluate each of the Mitchells' claims in light of our analysis of the Supreme Court's decision in *Medtronic.*

■ As we pointed out in *Mitchell I,* 67 F.3d at 1280, the Mitchells' strict liability claim consists of allegations that Zyderm was an unreasonably dangerous product and that Collagen knew or should have known that Zyderm was unreasonably dangerous and had the potential for causing serious immunological and/or autoimmune reactions, damage and injuries when injected into humans. We believe that this claim is preempted by the PMA process for a Class III medical device. Approval by the FDA constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling. The FDA's determination is specific to the product. A state court judgment premised on a contrary determination, as a finding of liability based on the Mitchells' strict liability claim necessarily would be, would constitute, for the reasons we have stated earlier, a requirement "different from, or in addition to," the standard required by federal authority.

■ The Mitchells' negligence claims must be considered preempted to the extent that they allege that Collagen was negligent despite its adherence to the standards required by the FDA in its PMA for this specific product. A state court judgment premised on a determination that such a specific allegation is true would necessarily conflict with the determination of the FDA that its requirements rendered the product safe and effective.[6]

■ We come next to the Mitchells' mislabeling, misbranding and adulteration claims. Again, to the extent that these allegations claim that Collagen has incurred lia-

5. *See also Kernats v. Smith Indus. Med. Sys.,* 283 Ill.App.3d 455, 218 Ill.Dec. 774, 669 N.E.2d 1300 (1996) (holding that both statutory and common law causes of action were not preempted because they had not been specifically developed with respect to medical devices), *pet'n for cert. filed,* 65 U.S.L.W. 3632 (U.S. Mar. 4, 1997) (No. 96-1405).

6. To the extent that the Mitchells' complaint may be read as alleging that Collagen was negligent in its adherence to the standards of the FDA in the PMA, the negligence claim would not be preempted. It would, however, be subject to dismissal on the merits because the Mitchells failed to meet their burden on summary judgment.

bility under state law despite its conformity to the requirements of the PMA, the state law claims must be considered preempted. Permitting such claims would add requirements that are "different from, or in addition to," those established through the PMA process. However, to the degree that these claims may be read to allege that Collagen failed to meet the standards set forth in the PMA process, the allegations are not preempted; a state judgment premised on the truth of those allegations would not set up a requirement "different from, or in addition to," those established by the FDA. Such a state judgment simply would enforce the standard embodied in the federal PMA. Absent an explicit determination by the FDA that such a judgment would interfere with the operation of the federal scheme, we do not believe that *Medtronic* affords a basis for our assuming such interference.[7] In our earlier opinion, however, we determined that the Mitchells' mislabeling and misbranding claims were not based on the requirements of the PMA, but were directed more generally to the labeling and branding practices of Collagen. As did the district court, we further assumed that the adulteration claim was precluded by the Mitchells' failure to come forward on summary judgment with sufficient evidence to counter Collagen's assertion that the product had been free from adulteration throughout its manufacturing history under the PMA.[8]

The Mitchells' complaint also alleges that Collagen committed fraud through its representations to the FDA during the PMA process. We do not believe that our earlier decision that this claim is preempted is altered by *Medtronic*. We continue to believe that this issue was decided correctly by the Third Circuit in *Michael v. Shiley, Inc.*, 46 F.3d 1316, 1328–29 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995).

As we pointed out in our earlier opinion, the Mitchells also alleged that Collagen had committed fraud through misrepresentations about the product. To the extent that this allegation is based on the labeling of the product in conformity with the PMA requirements of the FDA, the claim is preempted for the same reasons that similar misbranding and mislabeling claims are preempted. The sufficiency of this information has been approved explicitly by the FDA.

In our earlier opinion, we noted that, on appeal in their reply brief to this court, the Mitchells contended that the fraud allegation also encompassed allegations of fraud in advertising and promotional materials. In our earlier opinion, we held in the alternative that, even if the Mitchells were given the benefit of the doubt with respect to the specificity of these claims—and we continue to believe that the claims are too vague—their claims could not survive. First of all, as we pointed out in our earlier opinion, Collagen submitted, through an exhibit attached to the affidavit of Dr. Erickson, a statement noting that the FDA had regulated advertising with respect to Zyderm. The Mitchells have not disputed this submission. Therefore, it must be accepted as admitted that promotional materials were subject to regulation under this PMA. As a consequence, these claims would survive only to the degree that they allege that the material did not conform to the specifications of the PMA. However, even if we make that assumption, the Mitchells have failed to meet their burden on summary judgment. The district court's grant of summary judgment must stand.

The Mitchells also alleged in their complaint the following warranty claim: "At all material times, Defendant, Collagen Corporation ... warranted and represented to Plaintiff, Barbara Mitchell, that [Zyderm]

7. *See* 21 C.F.R. § 808.1(d)(2) (stating that state or local requirements "equal to, or substantially identical to," federal requirements imposed under the PMA are not preempted).

8. The Mitchells contend that we ought to revisit this question. It was addressed by the district court in its opinion, *see Mitchell v. Collagen,* 870 F.Supp. 885, 896–97 & n. 19 (N.D.Ind.1994), by this panel in our original opinion and on petition

for rehearing. We do not believe that the Supreme Court's opinion gives us any reason to revisit the matter again. It is sufficient to say that we have traced carefully the long and convoluted motions practice in the district court, and we are satisfied that the district court did not commit reversible error in its determination that both parties had been given an adequate opportunity to address the merits.

was safe for [its] intended use and purpose." Compl. at 2. As we noted in our earlier opinion, the Mitchells did not specify the nature of the alleged warranty or its substance before the district court.

If the Mitchells meant to allege an implied warranty, it is preempted. As we noted in our earlier opinion, an implied warranty claim is based on the accepted standards of design and manufacture of the products. In the case of a product that has gone through the PMA process, these criteria are set by the FDA. A state judgment for breach of implied warranty that rested on allegations about standards other than those permitted by the FDA would necessarily interfere with the PMA process and, indeed, supplant it. Accordingly, such a claim is preempted.

An express warranty claim poses a different situation. As we noted in our earlier opinion, such warranties arise from the representations of the parties and are made as the basis of the bargain between them. A state judgment based on the breach of an express representation by one of the parties does not necessarily interfere with the operation of the PMA, and therefore we cannot say that such a cause of action is preempted. Nevertheless, as we noted in our earlier opinion, we do not believe that the Mitchells can assert such a claim at this stage of the litigation. They have never specified whether their claim was based on an express or an implied warranty. Nor have they ever stated the nature of any express warranty. The district court was therefore entirely justified in granting summary judgment.[9]

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

9. We note that we would reach this result even if we were to accept the Mitchells' characterization of the summary judgment as one limited only to the issue of preemption. Assuming arguendo the correctness of that view, it still would have been incumbent on the district court to grant the mo-tion. Without any indication from the Mitchells that the warranty was express rather than implied and without indication as to the substance of any express warranty, they could not have prevailed.