**Norman Virgil WOODS, Plaintiff,**

v.

**GLIATECH, INC. et al, Defendants.**

No. CIV.A.7:01CV00314.

United States District Court,
W.D. Virginia,
Roanoke Division.

Aug. 27, 2002.

---

Charles H. Smith, III, Simon Delano Roberts Moore, Jimmy Frank Robinson, Jr., Anthony Marc Russell, Gentry, Locke, Rakes & Moore, Roanoke, VA, for Plaintiff.

William Henry Robinson, Jr., Wright, Robinson, Osthimer & Tatum, Richmond, VA, Jane Siobhan Glenn, Brian R. Jones, Jones & Glenn, PLC, Roanoke, VA, Randolph C. DuVall, Breeden, Salb, Beasley & DuVall, PLC, Norfolk, VA, for Defendants.

## MEMORANDUM OPINION

WILSON, Chief Judge.

Plaintiff Norman Virgil Woods ("Woods") brought this personal injury action against defendants Gliatech, Inc., Gliatech, Gliatech Medical, Inc., Gliatech R & D Inc., and GIC, Inc. ("Gliatech") alleging negligence, breach of warranty and fraud arising out of Gliatech's development and distribution of ADCON–L, a medical device. This court has jurisdiction pursuant to 28 U.S.C. § 1332. This matter is before the court on Gliatech's motion for summary judgment. Gliatech maintains that because it obtained premarket approval for ADCON–L from the United States Food and Drug Administration ("FDA") pursuant to the Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act ("MDA"), 21 U.S.C. § 360k(a) of the MDA preempts Woods' state law claims. For the reasons stated below, the court denies Gliatech's motion.

## I.

Gliatech developed, tested, distributed, and marketed ADCON–L, a gel-like product for use in surgical back procedures to inhibit post-surgical peridural scar tissue formation, thereby lessening post-surgical pain caused by scarring. ADCON–L is classified by the FDA as a Class III medical device. In 1996, Gliatech submitted a premarket approval application ("PMA") to the FDA for ADCON–L. The PMA contained clinical trial information and testing data from a European study and the interim results from a yet to be completed U.S. clinical study. The FDA determined, in light of the European study and interim results of the U.S. study, that "the benefits of using [ADCON–L] outweigh the risk of illness when used as indicated." (Def.'s Mem. in Supp. of Summ. J., Ex. B) On May 27, 1998, the FDA conditionally approved Gliatech's PMA for ADCON–L. In a letter notifying Gliatech, the FDA stated:

We are pleased to inform you that the PMA is approved subject to the "Conditions of Approval" (enclosed). You may begin commercial distribution of the device upon receipt of this letter . . . .

The labeling for your device is incomplete since it includes interim results of

the U.S. clinical trial .... Therefore, in addition to the postapproval requirements in the enclosure, you must complete the 370 subject U.S. clinical trial being conducted ... and provide postapproval supplements to your PMA which include the following information:

1. Within thirty days of the receipt of the approval order, you must provide a description of the twelve month longer term clinical outcome data that you will collect on the 370 subjects enrolled in your U.S. clinical trial (G940001).

2. The final report for your U.S. clinical trial (G940001) must be provided within three months of study completion.

3. Revised draft labeling that replaces the results of the interim analyses for the U.S. clinical trial with the final study results at six months, and that reflects longer term clinical outcome at twelve months must be provided.

(Aff'd Robert J. Bard, Ex. 1)

Additionally, the approval letter stated: "Failure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act." (*Id.*)

After completing the U.S. study, but before submitting the results to the FDA, Gliatech personnel reviewed the results and found that the U.S. study did not demonstrate ADCON–L's effectiveness. Instead of reporting this to the FDA, however, Gliatech personnel manipulated the data to suggest that ADCON–L was effective. In March 1999, Gliatech submitted to the FDA a report of the final U.S. study which contained false and misleading data. (*See* Plea Agreement entered by Gliatech in U.S.D.C. for the N.D. Oh., Pl's Mem. in Opp. to Mot. for Summ. J., Ex. 1)

From "January 1999 through February 2000, Gliatech received complaints from

surgeons regarding serious adverse medical reactions suffered by surgical patients in the course of or following surgeries in which ADCON–L had been used." (*Id.*) Some of these complaints "pertained to cerebrospinal fluid leaks (CSF leaks)." (*Id.*) Although Gliatech was required to notify the FDA of these adverse events by filing a Medical Device Report ("MDR"), Gliatech failed to do so. "MDRs are publicly available documents. Thus, back surgeons and other medical professionals, potential back surgery patients, and the general public would have had access to the MDRs had Gliatech filed them." (*Id.*)

On April 26, 1999, spinal surgeon Dr. James M. Leipzig performed back surgery (lumbar discectomy) on Woods at Lewis Gale Medical Center. During the surgery, Dr. Leipzig applied ADCON–L to the surgical site to prevent the formation of scar tissue. Woods alleges that within a few days following the surgery, he experienced significant headaches, nausea and photophobia, resulting from a leak of CSF fluid, which he claims ADCON–L caused.

In early 2000, the FDA uncovered misconduct by Gliatech with respect to the PMA and the reporting requirements for ADCON–L, and the Department of Justice followed with an investigation of Gliatech. In December 2000, the FDA determined that the provisions of the Application Integrity Policy (also known as the Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities Policy) should apply to Gliatech based on FDA findings that Gliatech failed to provide reliable data.

In January 2001, Gliatech recalled ADCON–L from the market. The recall, according to Gliatech, was for reasons unrelated to this case. Woods, however, disagrees.[1] On April 27, 2001, Woods

---

1. It is unclear exactly why or how ADCON–L

was removed from the market. Gliatech

filed this lawsuit for personal injuries against Gliatech claiming negligence, breach of warranty and fraud on the public.

In April 2002, the Department of Justice filed an information against Gliatech in the United States District Court for the Northern District of Ohio, Eastern Division. Gliatech pled guilty to six counts, including four counts of failure to notify the FDA of reportable events in violation of 21 U.S.C. §§ 331(q)(1)(B) and 333(a)(1), one count of adulteration of a medical device in violation of 21 U.S.C. §§ 331(k) and 333(a)(1), and one count of submitting a materially false and misleading report regarding a medical device in violation of 21 U.S.C. §§ 331(a)(2) and 333(a)(1). (*Id.*)

Robert J. Bard, Vice President of Gliatech, states in an affidavit that the "FDA has never advised Gliatech, Inc. that Gliatech, Inc. failed to comply with the conditions set forth on page two of the approval letter of May 27, 1998", and that an FDA official advised him in November, 2001, that Gliatech had " an approved PMA." (Aff'd Bard) According to Bard "[t]he FDA has never revoked nor withdrawn the regulatory approval granted to Gliatech, Inc. to market ADCON–L in the United States." (Aff'd Bard)

## II.

The MDA governs the regulation of medical devices. It divides them into three classes. Both parties agree that ADCON–L is a Class III device. Before marketing a new Class III device, the manufacturer must give the FDA "reasonable assurance" that the device is both safe and effective. 21 U.S.C. § 360e(d)(2). "Despite its relatively innocuous phrasing, the process of establishing this 'reasonable

assurance,' which is known as the 'pre-market approval,' or 'PMA' process, is a rigorous one. Manufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews." *Medtronic Inc. v. Lohr*, 518 U.S. 470, 477, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

If the FDA approves a PMA, "it does so subject to conditions described in a document entitled 'Conditions of Approval.'" *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 223 (6th Cir.2000). This form requires manufacturers to submit the device's proposed labeling before marketing, limits advertising to the approved labeling, requires the manufacturer to submit a PMA supplement for review and approval before making any change affecting the safety or effectiveness of the device, requires the manufacturer to submit post-approval reports, and requires the manufacturer to report any incidents of adverse reaction to, or known defect of, the approved device. *Id.* at 222

FDA regulations state:

FDA may impose postapproval requirements in a PMA approval order .... Postapproval requirements may include as a condition to approval of the device:

. . . . .

(2) continuing evaluation and periodic reporting on the safety, effectiveness, and reliability of the device for its intended use. FDA will state in the PMA approval order the reason or purpose for such requirement and the number of patients to be evaluated and the reports required to be submitted.

. . . . .

(9) Such other requirements as FDA determines are necessary to provide

---

claims that it recalled ADCON–L for reasons unrelated to this lawsuit. Woods contests this characterization. Furthermore, Gliatech claims that the FDA did not take any action to

rescind its conditional approval of the PMA. This, however, is not surprising considering that Gliatech took ADCON–L off the market. No further FDA action was necessary. ·

reasonable assurance, or continued reasonable assurance, of the safety and effectiveness of the device.

21 C.F.R. § 814.82(a). "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device," 21 C.F.R. § 814.80. The MDA and its implementing regulations authorize the FDA to suspend temporarily a PMA if it determines that there is a reasonable probability that continued distribution of the device would cause serious, adverse health consequences or death. 21 U.S.C. § 360(e)(3) and 21 C.F.R. § 814.47. If the manufacturer has not met all post-approval requirements, if the device is unsafe or ineffective, or if the PMA contained or was accompanied by an untrue statement of material fact, the FDA can withdraw approval. 21 U.S.C. § 360(e)(1) and 21 C.F.R. 814.46.

In this case, Gliatech argues that the MDA preempts Woods' state law claims. Congress included an express preemption provision in the MDA which provides:

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement -

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). "The determination regarding the scope of an express preemption provision 'does not occur in a contextual vacuum,' but rather is guided by the twin presumptions 'that Congress does not cavalierly pre-empt state-law causes of action' and 'that "[t]he purpose of Congress is the ultimate touchstone" in every preemption case.'" *Duvall v. Bristol–Myers–Squibb Co.*, 103 F.3d 324, 328 (4th Cir. 1996) (quoting *Medtronic Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)).

In *Lohr*, the Supreme Court considered the preemptive scope of § 360k(a). "A majority of the *[Lohr]* Court first determined that a state-law damages action may impose a requirement within the meaning of § 360k(a)." *Duvall*, 103 F.3d at 329.[2] Although "state common-law causes of action may constitute requirements, [ ] such requirements are preempted [under § 360k(a) ] when they conflict with a specific regulation promulgated by the FDA with respect to the particular device in question or a device-specific requirement imposed by the MDA."[3] *Id.* at 330.

**2.** As the Eleventh Circuit noted:

The *Lohr* Court split 4–4 over whether a jury's imposition of liability in a product liability suit pursuant to state common law duties would ever amount to a conflicting state requirement subject to federal preemption. Justice Breyer provided the fifth vote necessary to support the Court's holding that none of the Lohrs' claims were preempted but asserted that he agreed with Justice O'Connor's dissenting opinion on the extent to which more appropriate FDA requirements might preempt state law claims. *See Lohr*, 518 U.S. at 503, 116 S.Ct. at 2259 (Breyer, J., concurring.) A

number of courts have parsed these opinions and the actual votes only to arrive at conflicting positions.

*Goodlin v. Medtronic, Inc.*, 167 F.3d 1367, 1371 n. 7 (11th Cir.1999).

**3.** "In addressing the federal requirement condition of section 360k(a)(1), the *Lohr* Court sought guidance from an FDA regulation interpreting the preemption provision .... [F]ive justices agreed that the FDA's 'view of the statute' was entitled to substantial weight." *Goodlin v. Medtronic, Inc.*, 167 F.3d 1367, 1372 (11th Cir.1999) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. at 496, 505–07, 116

Gliatech has not pointed to a specific FDA directive with respect to ADCON–L other than the FDA's May 28, 1998 letter conditionally approving the PMA and allowing Gliatech to begin commercial distribution of the device. Gliatech argues that the FDA's conditional approval of the PMA and the accompanying findings about the safety and effectiveness of ADCON–L constitute a specific federal requirement that preempts Woods' claims. Gliatech points to cases suggesting that the PMA approval process itself constitutes a specific federal requirement. *See Mitchell v.*

*Collagen Corp.,* 126 F.3d 902 (7th Cir. 1997); *Martin v. Medtronic, Inc.,* 254 F.3d 573 (5th Cir.2001); *Papike v. Tambrands, Inc.,* 107 F.3d 737 (9th Cir.1997); *Kemp v. Medtronic, Inc.,* 231 F.3d 216 (6th Cir. 2000). The Seventh Circuit, for example, has stated:

> During the PMA process, the federal government, it can truly be said, has "weighed the competing interest relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing

S.Ct. 2240 (Breyer, J., concurring)). FDA regulation, 21 C.F.R. § 808.1, advises:

> (d) State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements....
>
>> (1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.
>>
>> (2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act....
>>
>> (6)(ii) Generally, section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirements, then the prohibition will be preempted if the requirement is different from, or in addition to, a Federal requirement established under the act. In determining whether such a requirement is preempted, the determinative factor is

> how the requirement is interpreted and enforced by the State or local government and not the literal language of the statute, which may be identical to a provision in the act.

Accordingly, many courts following the language in *Lohr* have held that specific FDA requirements do not preempt state law causes of action that have no additional or different requirements than those promulgated by the FDA. *Lohr,* 518 U.S. at 495, 116 S.Ct. 2240 ("Nothing in § 360k denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements"); *Buckman,* 531 U.S. 341, 353, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) ("[*Lohr*] can be read to allow certain state-law causes of action that parallel federal safety requirements."); *see also Brooks v. Howmedica, Inc.,* 273 F.3d 785, 798 (8th Cir.2001) ("a claim of failure to comply with FDA regulations is not preempted by [§ 360k of] the MDA ... since such a state claim imposes no requirement 'different from, or in addition to' any federal requirement."); *Martin v. Medtronic, Inc.,* 254 F.3d 573, 583 (5th Cir.2001) ("tort suits based on a manufacturer's failure to follow the FDA's regulations and procedures are not preempted."); *Chambers v. Osteonics Corp.,* 109 F.3d 1243, 1248 (7th Cir.1997) (negligent manufacturing claim not preempted because it "would impose no greater requirements on [defendant] than the FDA itself imposed"); *Martin v. Telectronics Pacing Systems, Inc.,* 105 F.3d 1090, 1101 (6th Cir.1997) ("As indicated by [*Lohr*] ... a claim that [defendants] did not comply with MDA regulations governing its device would not be preempted and [plaintiffs] could pursue a remedy in state court").

considerations should be resolved in a particular case or set of cases and implemented the conclusion via a specific mandate on manufacturers or producers."

*Mitchell v. Collagen Corp.,* 126 F.3d 902, 911 (7th Cir.1997) (citation omitted).

 Woods, however, points to an Eleventh Circuit case finding that the FDA's review and approval of the PMA, by itself, imposes no ascertainable federal requirements. *Goodlin v. Medtronic, Inc.,* 167 F.3d 1367 (11th Cir.1999). According to the Eleventh Circuit "[in] the typical PMA review and approval ... the FDA issues no regulation, order, or any other statement of its substantive benchmark. The approval represents only a finding that the manufacturer's proposal to market a device has reasonably assured the FDA of the device's safety and effectiveness ... [and that the applicant] may bring to market its device." *Id.* at 1375. The FDA's approval of a PMA does not "provide any indication of what (if any) specific substantive requirements the FDA may have applied to reach that result." *Id.* The court rejected the defendants' attempts "to convert the FDA's finding and accompanying permission to market its device into the federal government's implied validation of the safety of its device and every step of its manufacture and, then, to use that validation as a shield against liability in tort." *Id.* This court is persuaded by the Eleventh Circuit's reasoning and concludes that the FDA's conditional approval of Gliatech's PMA is not a specific requirement that preempts state law.[4]

While this conclusion alone is sufficient to allow Woods' negligence and breach of warranty claims to proceed, Woods' fraud claim requires further analysis. Courts have been skeptical of allowing fraud claims to escape preemption · because it could open a "pandora's box of judicial scrutiny of FDA decision making." *Kemp v. Medtronic,* 231 F.3d 216, 234 (6th Cir. 2000). Gliatech argues that allowing fraud claims to avoid preemption "would lead inevitably to civil juries attempting to second guess what the FDA would have done." (Def.'s Reply Mem. in Supp. of Summ. J.) Gliatech quotes extensively from *Michael v. Shiley, Inc.,* 46 F.3d 1316, 1329 (3d Cir.1995), a case decided before the Supreme Court addressed § 360k preemption in *Medtronic, Inc. v. Lohr:*

> This inquiry could ultimately require that a court determine whether the information [the defendant] submitted was truthful, whether it was complete, whether FDA procedures sufficed to avoid a material misrepresentation, and whether the FDA should have or would have approved the device despite the misrepresentation. In sum, this claim requires a Court, applying state law, to perform the same function initially entrusted to the FDA.

> Section 360k does not permit such a searching state inquiry into the inner working of FDA procedures ....

> Nor can [the plaintiff] revive the preempted fraud claim by characterizing it as a defense to pre-emption .... In essence, [the plaintiff] argues that we should not permit [the defendant] to in-

---

4. The FDA's approval of ADCON–L was expressly subject to certain conditions, including Gliatech's completion of the U.S. study and revision of ADCON–L's labeling to include the results. The FDA's approval letter specifically stated: "Failure to comply with the conditions of approval invalidates this approval order." (Aff'd Robert J. Bard, Ex. 1)

Gliatech subsequently pled guilty to submission of materially false and misleading data with respect to the U.S. study. Thus, even assuming the conditional PMA constitutes a preemptive requirement, the court finds that Gliatech's failure to comply with the PMA conditions invalidated the FDA's approval of ADCON–L.

voke the cloak of federal preemption when it obtained that cloak through the fraudulent manipulation of the regulatory process.

While we do not condone misconduct by medical device manufacturers, we cannot agree with [the plaintiff's] theory. If a medical device manufacturer's claim that the MDA preempts a plaintiff's cause of action depends in the first instance upon proof that its pre-market approval was not fraudulently obtained, the Courts would have to engage in the intrusive inquiry which we have just demonstrated is forbidden .... This argument thus presents not less, but greater interference with the FDA's decisions. An attempt to reexamine the FDA's approval under state law standards, however pleaded, is preempted by § 360k.

*Michael*, 46 F.3d at 1329.

Indeed, the Supreme Court in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), saw no need to address the express preemption provisions of § 360k, instead holding that state-law fraud-on-the-FDA claims are impliedly preempted because of their inherent conflict with the federal regulatory scheme. In *Buckman*, the plaintiffs alleged that the defendant made fraudulent misrepresentations to the FDA in obtaining approval to market a medical device and those misrepresentations were the cause of plaintiffs' injuries. *Id.* at 343, 121 S.Ct. 1012. The Court rejected that argument, however, holding that state law fraud actions based on misrepresentations to the FDA are impliedly preempted because of the unavoidable conflict with federal regulations. *Id.* at 344, 121 S.Ct. 1012. The Court was concerned that fraud-on-the-FDA claims would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Buckman*, 531 U.S. at 350, 121 S.Ct. 1012. Moreover, "[a]s a practical matter, comply-ing with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants ...." *Id.*

It is worth noting that a number of courts have read *Buckman* to apply only to fraud claims that necessarily depend on violations of specific federal requirements. These courts rely on *Buckman*'s distinction between fraud on the FDA claims and "other state tort claims for fraudulent labeling, such as those that the Court previously addressed in [*Lohr*]." *Dawson ex rel. Thompson v. Ciba–Geigy Corp.*, 145 F.Supp.2d 565, 573 (D.N.J.2001) ("*Buckman* thus clarified that traditional state tort law claims ... are not necessarily preempted ... and are not necessarily the same as 'fraud on the FDA' type claims"). In *Buckman*, the plaintiffs alleged that the fraud on the FDA was the "but-for" cause of plaintiffs' injuries. According to plaintiffs' theory in *Buckman*, had the FDA known of the fraud, it would not have approved the medical devices, and consequently, plaintiffs would not have used them. *Buckman*, 531 U.S. at 343, 121 S.Ct. 1012. The Court was concerned in *Buckman* that plaintiffs were not "relying on traditional state tort law which had predated the federal enactments in questions" but instead on "the existence of ... federal enactments." *Buckman*, 531 U.S. at 353, 121 S.Ct. 1012. As another court has noted, "the Court, in *Buckman* seemed to go out of its way to focus on the fact that the federal enactment at issue was absolutely critical to the plaintiff's 'fraud on the FDA' claim." *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1018, 1039 n. 17 (S.D.Ill.2001). Therefore, many courts distinguish "fraud on the FDA" from state fraud claims alleging fraud against the public generally where no reference to any federal regulation or directive is made or required. *See Beh-*

*rens v. United Vaccines, Inc.* 189 F.Supp.2d 945 (D.Minn.2002).

In this case, Woods' fraud claim is based on material misrepresentations to "consumers and users and patients" and not on misrepresentations to the FDA. (Pl.Comp.) It, therefore, avoids the concerns identified in *Buckman.* Moreover, the court finds that the convergence of three compelling factors clearly sets this case apart from lawsuits that have the potential of removing the FDA as the sole gatekeeper under the MDA.

First, the conditional approval of AD-CON–L is said to be the federal requirement that preempts plaintiff's negligence, breach of warranty, and fraud claims. As stated earlier, however, conditional approval, without more, neither provides a substantive benchmark nor implies that the FDA has endorsed the safety of the device or its manufacturing process. Conditional approval, by itself, is not a preemptive event; it is not a preemptive federal requirement. Conditional approval leaves the gate open to claims that do not conflict with a *specific* federal requirement. Second, the FDA has formally determined that Gliatech committed misconduct during the approval of the PMA for ADCON–L and placed Gliatech on restrictions under its Application Integrity Policy. That event holds the gate open. Finally, Gliatech pled guilty because it failed to notify the FDA of adverse events, adulterated a medical device, and submitted a materially false and misleading report. If the gate had not been open, that event would have opened it.

■ The first of these events, by itself, poses only a potential risk of conflict with the FDA's crucial gatekeeping role under the MDA. Surely, the convergence of the second and third events eliminates that risk altogether. Under these circumstances, plaintiff's claims "would not depend upon speculation as to the FDA's behavior in a counterfactual situation." *Buckman,* 531 U.S. at 354, 121 S.Ct. 1012 (Stevens, J., concurring). Instead, plaintiff can establish his claim "without second-guessing the FDA's decisionmaking" and without endangering important MDA policies. *Id.*

In *Medtronic, Inc. v. Lohr,* the Supreme Court cautioned that Congress will not supersede "the historic police powers" of the states by federal statute without making that purpose "clear and manifest," and that the "purpose of Congress is the ultimate touchstone" in every preemption case. *Lohr,* 518 U.S. at 485, 116 S.Ct. 2240. The court rejects the notion that Congress intended § 360k(a) to preempt traditional common law causes of action in cases where a manufacturer obtained only conditional approval from the FDA to market a medical device, the FDA determined that the manufacturer committed misconduct in the approval process, and the manufacturer pled guilty to fraud on the FDA. In the words of Justice Stevens in *Medtronic, Inc. v. Lohr:*

> Under [defendant's] view of the statute, Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device. Moreover, because there is no explicit private cause of action against manufacturers continued in the MDA, and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by defective medical devices. [Defendant's] construction of § 360k would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order "to provide for the safety and effectiveness of medical devices intended for human use." It is, to say the

least, "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct," and it would take language much plainer than the text of § 360k to convince us that Congress intended that result.

*Lohr,* 518 U.S. at 487, 116 S.Ct. 2240.

## III.

For the foregoing reasons, the court finds that 21 U.S.C. § 360k does not preempt Woods' claims and denies Gliatech's motion for summary judgment. The court will enter an appropriate order this day.

## *ORDER*

For the reasons stated in the court's accompanying Memorandum Opinion, it is **ORDERED** and **ADJUDGED** that Gliatech, Inc.'s motion for summary judgment is **DENIED**.