Janice L. DUNLAP, Plaintiff,

v.

MEDTRONIC, INC., Defendant.

No. 3:97 CV 7148.

United States District Court,
N.D. Ohio,
Eastern Division.

March 29, 1999.

Harold M. Hanna, Hanna & Hanna, Bowling Green, OH, for Janice L Dunlap, Individually and as Administrator of the Estate of—Darrell M Dunlap, Deceased, plaintiff.

Thomas M. Parker, Sanjay K. Varma, Roetzel & Andress, Akron, OH, for Medtronic, Inc., defendant.

## MEMORANDUM OPINION

KATZ, J.

This matter is before the Court on Defendant's motion for summary judgment, Plaintiff's opposition, Defendant's reply, Plaintiff's surreply, and Defendant's supplemental memorandum thereto. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND

Medtronic, Inc. manufactures the Medtronic SynchroMed Implantable Drug Pump which is surgically implanted and, in conjunction with a catheter, delivers medication necessary for pain management. On June 20, 1994, Darrell Dunlap had a SynchroMed Pump and spinal catheter installed to relieve intractable back pain in the treatment of his chronic osteoporosis. Initially, the device functioned well and achieved optimal results. However, after several days, Mr. Dunlap began experiencing pain again. Following a series of procedures which revealed lacerations in the Medtronic catheter, Mr. Dunlap's physicians removed and replaced the damaged catheter with one manufactured by Bard–Dupen. The catheter was replaced on July 29, 1994. On January 22, 1996, Mr. Dunlap died. His estate and his surviving wife instituted a lawsuit in state court which the Defendant subsequently removed to federal court.

Plaintiff alleges claims sounding in product liability, breach of warranties, wrongful death, survival action and emotional distress, all under state law. Her prayer seeks compensatory and punitive damages as well as attorney's fees, expenses and costs. Defendant moves for summary judgment on the basis that this action is: (1) barred by the statute of limitations; (2) preempted by federal law; (3) barred by the learned intermediary doctrine; and (4)

that Plaintiff lacks sufficient evidence to support the allegations in her complaint. As the issues have been briefed, the matter is now ready for disposition.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be ren-

dered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### B. Statute of Limitations

■ Under Ohio law, actions for personal injuries are governed by a two year statute of limitations under Ohio Rev.Code § 2305.10. In injury cases, Ohio implements the discovery rule, which allows for a cause of action to accrue when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury. *O'Stricker v. Jim Walter Corp.,* 4 Ohio St.3d 84, 447 N.E.2d 727 (1983). The purpose behind this rule recognizes that "the injury complained of may not manifest itself immediately and, therefore, it would be unfair to preclude a person from asserting a claim when discovery of the injury comes so far after the negligent act." *Columbus Board of Education v. Armstrong World Industries, Inc.,* 89 Ohio App.3d 846, 851–52, 627 N.E.2d 1033 (1993).

■ Ohio also acknowledges the "cognizable event" rule, which allows for the accrual of an action (1) when the injured party became aware, or should have become aware, of the extent and seriousness of his condition; (2) whether the injured party was aware, or should have been aware, that such condition was related to a specific medical service previously rendered him; and (3) whether such condition would put a reasonable person on notice of need for further inquiry as to the cause of such condition. *Hershberger v. Akron City Hosp.,* 34 Ohio St.3d 1, 516 N.E.2d 204 (1987). The question of whether a cognizable event has occurred turns upon the facts and circumstances of each particular case. *Rose v. Women's Health Clinic,* 90 Ohio App.3d 776, 630 N.E.2d 760 (1992).

Medtronic asserts that since the faulty catheter was removed in July 1994, Plain-

tiff's cause of action arose as of that date and is barred as it was filed more than two years later in January 1997. Plaintiff contends that while the intrathecal[1] catheter was replaced, the SynchroMed Pump remained in place, as did Medtronic's transfer catheter, until the time of Mr. Dunlap's demise and did not function properly, thus contributing to his pain and suffering up and until his death in January 1996. Plaintiff states that the injury caused by the defective device continued until Mr. Dunlap's death and, presumably, that her cause of action did not accrue for statute of limitations purposes.

■ In support of her claims Plaintiff relies upon the affidavit of Dr. Teitelbaum, who avers that the Medtronic device, which includes the pump and catheter, "caused or contributed" to the decedent's pain and suffering. (Teitlebaum Aff. ¶ 13.) At his deposition preceding the affidavit, Dr. Teitlebaum acknowledged that after the July 1994 surgical procedures, the pump was functioning as expected. Mr. Dunlap's pain continued after July 1994 and Dr. Teitlebaum referenced other factors, such as the patient's tolerance to the medication along with his severe osteoporosis. Further, there is nothing in Dr. Teitlebaum's deposition testimony which indicates that any defect in the transfer catheter caused Mr. Dunlap's continued pain. Therefore, to the extent that Dr. Teitlebaum's subsequent affidavit contradicts his deposition testimony and without any explanation to the contrary[2], the

Court will disregard any contrary conclusions or assertions by Dr. Teitelbaum.

■ However, the question still remains as to whether for statute of limitation purposes Plaintiff was on notice at the time the Medtronic intrathecal catheter was removed. While Dr. Teitlebaum could not remember specifically what he told the Dunlaps prior to the surgery, he testified that he "would have told them that something appeared not to be functioning, we didn't know what." (Teitlebaum Dep., p. 87.) In response to a question as to whether Dr. Teitlebaum ever informed the Dunlaps as to the replacement of the Medtronic catheter, he responded:

A: I'm certain we told them whatever we did.

B: You're certain that you would have told them on or about July 29th that you had removed the Medtronic catheter and replaced it with a catheter made by someone else?

C: Yes, I'm certain that either—if I didn't tell them that, Dr. Hess would have told them. We almost certainly told Darrell himself while the surgery was going on what we were doing.

(Id., pp. 128–129.)

Following this surgery, however, Dr. Teitlebaum stated that the quality of pain relief "was not very satisfactory" and thereafter, "pain control became unacceptable" as "the quality of the pain control gradually deteriorated." (Id., pp. 92, 98.)

---

1. Referring to the area underneath the membranes covering the spinal cord.

2. Conflicts between affidavits and other evidentiary materials do not preclude summary judgment and the court may disregard the subsequent affidavit unless a legitimate reason is given for the discrepancy. *See Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir.1977) (party cannot create a genuine issue of material fact by filing an affidavit after summary judgment has been made, that contradicts the earlier deposition testimony); *Dotson v. U.S. Postal Service,* 977 F.2d 976, 978 (6th Cir.), *cert. denied,* 506 U.S. 892, 113

S.Ct. 263, 121 L.Ed.2d 193 (1992) (party cannot rely upon an affidavit contradicting prior sworn testimony); *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986). Generally, however, a deposition is given more weight as it affords the opposing side an opportunity for cross-examination not available in an affidavit. To the extent that the subsequent affidavit contradicts the prior sworn testimony without explanation, the Court disregards these averments. *See also* 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.14[1][f] (3d ed.1998).

The reason for the replacement of the Medtronic catheter was to remove portions of the device which were defective and thereby provide optimal pain relief through the SynchroMed device. According to Dr. Teitlebaum, the Dunlaps "had concerns about the reliability of the whole system" shortly after the device was implanted. (Id., p. 130.) The Dunlaps were made aware by the physicians that the Medtronic catheter had defects and that it was replaced. Considering the Dunlaps' concerns about the device and the replacement of the defective catheter, under either the "cognizable event" test or the discovery rule, they were clearly put on notice as of the July 29th surgery of the need to pursue their possible remedies.

The record before the Court contains evidence that the decedent and his surviving spouse were advised by Dr. Hess that the problematic catheter had been replaced with a new catheter. Dr. Teitlebaum's deposition testimony does not indicate any subsequent problems with the SynchroMed Pump following the replacement of Defendant's catheter. However, Dr. Teitlebaum's subsequent affidavit is at odds with his deposition testimony and does not explain the discrepancy. Thus, the Court may not consider the contradictory affidavit. As Plaintiff was or should have been aware at the time the catheter was replaced, under the discovery rule, the statute of limitations began to run at the end of July 1994. Accordingly, Defendant's motion for summary judgment as to the statute of limitations issue is well taken.

Irrespective of this ruling, the Court addresses the remaining issues raised in Defendant's motion and for the reasons set forth below finds that Medtronic's motion is well taken as to those issues as well.

## C. Preemption by Medical Device Amendments, 21 U.S.C. § 321 et seq.

### 1. Regulatory Scheme

The Medical Device Amendments ("MDA"), were enacted in the the mid-1970s in response to consumer concern. The MDA gave the Food and Drug Administration ("FDA") authority over medical devices and allowed pertinent regulatory control. Under the MDA, medical devices are categorized into three classifications depending upon their risk to the public. The category of Class I devices must pose no reasonable risk of illness or injury and are subject to only minimal regulation by "general controls." 21 U.S.C. § 360c(a)(1)(A). Class II devices are potentially more harmful but can still be marketed without advance approval. Manufacturers, however, must comply with federal performance regulations known as "special controls" under § 360c(a)(1)(B).

The last classification, Class III devices, present potential unreasonable risk of illness or injury or are to be used in supporting or sustaining human life or for a use which is substantial importance in preventing impairment of human health. Unlike Class I or II devices, the manufacturer of a Class III device must establish "reasonable assurance or premarket approval ("PMA")" that the device is both safe and effective. 21 U.S.C. § 360e(d)(2).

The PMA process is rigorous because it is dependent upon the submission of detailed information regarding the effectiveness and safety of the device under review by the FDA. In the application for PMA, the manufacturer is required to submit the following information:

(A) full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective;

(B) a full statement of the components, ingredients, and properties and of the principle or principles of operation, of such device;

(C) a full description of the methods used in, and the facilities and con-

trols used for, the manufacture, processing, and, when relevant, packing and installation of such device;

(D) when identifying reference to any performance standard under section 360d of this title which would be applicable to any aspect of such device if it were a class II device, and either adequate information to show that such aspect of such device fully meets such performance standard or adequate information to justify any deviation from such standard;

(E) such samples of such device and of components thereof as the Secretary may reasonably require, except that where the submission of such samples is impracticable or unduly burdensome, the requirement of this subparagraph may be met by the submission of complete information concerning the location of one or more such devices readily available for examination and testing;

(F) specimens of the labeling proposed to be used for such device; and

(G) such other information relevant to the subject matter of the application as the Secretary, with the concurrence of the appropriate panel under section 360c of this title may require.

21 U.S.C. § 360e(c)(1).

Upon receipt of this information, the FDA spends an average of 1,200 hours reviewing the application. *Medtronic v. Lohr*, 518 U.S. 470, 477, 116 S.Ct. 2240, 2246, 135 L.Ed.2d 700 (1996). The FDA then refers the application to a panel for study and a report and recommendation regarding approval of the device. 21 U.S.C. § 360c(c)(2). Upon determination

**3. State and local requirements respecting devices**

**(a) General rule**

Except as provided in subsection (b) of this section, no State or political subdivision of a state may establish or continue in effect with respect to a device intended for human use any requirement—

that the manufacturer has provided the requisite "reasonable assurances," an order issues which allows the manufacturer to market the device precisely as approved. Any change in the approved labeling, product design, manufacturing changes that affect the safety and effectiveness of the device may cause the FDA's approval to be withdrawn. 21 U.S.C. § 360e(e)(1).

There are two exceptions to the PMA process; the first allows devices that are "substantially equivalent" to preexisting devices. 21 U.S.C. § 360e(b)(1)(B). The FDA reviews such devices under the § 510k process which is less intrusive, cheaper, quicker and does not focus on safety and effectiveness of the device. Second, the investigational device exception ("IDE") exempts new devices under clinical investigation to determine their safety or effectiveness and requires an alternative reviewing process different from that of the PMA process. 21 U.S.C. § 360j(g).

**2. *Lohr* and *Martin*.**

The Supreme Court in *Medtronic v. Lohr, supra*, had occasion to consider preemption under the MDA. The plaintiff in *Lohr* was a recipient of a pacemaker and sued Medtronic in state court asserting claims of negligence and strict liability. The device in *Lohr* was a Class III device but was approved under the "substantially equivalent" designation as opposed to the more rigorous PMA process. In a 5–4 decision, the Court held that the state claims were not preempted by § 360k(a)[3] of the MDA.

Writing the pleurality opinion, Justice Stevens began the discussion by noting

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

that the scope of preemption is tempered by two assumptions. First, the "historic police powers of the States were not to be superseded by the Federal Act unless this was the clear and manifest purpose of Congress." *Id.* at 2250 citing *Rice v. Santa Fe Elevator*, 331 U.S. at 230. Second, Congress' purpose is the "ultimate touchstone in a preemption case." The the understanding of that purpose is best gleaned from examination of the statute's language and the statutory framework.

Justice Stevens noted the express provision under § 360k(a) when read in conjunction 21 C.F.R. § 808.1(d)[4] mandated

4. (d) State and local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not "requirements applicable to the device" within the meaning of section 621(a) of the act. The following are examples of State and local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State of local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g. requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.

(2) Section 521(a) does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.

(3) Section 521(a) does not preempt State or local permits, licensing, registration, certification, or other requirements relating to the approval or sanction of the practice of medicine, dentistry, optometry, pharmacy, nursing, podiatry, or any other of the healing arts or allied medical sciences or related professions or occupations that administer, dispense or sell devices. However, regulations issued under section 520(e) or (g) of the act may impose restrictions on the sale, distribution or use of a device beyond those prescribed in State or local requirements. If there is a conflict between such restrictions and the State and local requirements, the Federal regulations shall prevail.

(4) Section 521(a) does not preempt specifications in contracts entered into by States or localities for procurement of devices.

(5) Section 521(a) does not preempt criteria for payment of State or local obligations under Medicaid and similar Federal, State or local health-care programs.

(6)(i) Section 521(a) does not preempt State or local requirements respecting general enforcement, e.g., requirements that State inspection be permitted of factory records concerning all devices, registration, and licensing requirements for manufacturers and others, and prohibition of manufacture of devices in unlicensed establishments. However, Federal regulations issued under section 519 and 520(f) of the act may impose requirements for records and reports and good manufacturing practices beyond those prescribed in State or local requirements. If there is a conflict between such regulations and State or local requirements, the Federal regulations shall prevail.

(ii) Generally, Section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibition will be preempted if the requirement is different from, or in addition to, a Federal requirement established under the act. In determining whether such a requirement is preempted, the determinative factor is how the requirement is interpreted and enforced by the State or local government and not the literal language of the statute which may be identical to a provision in the act.

(7) Section 521(a) does not preempt State or local provisions respecting delegations of authority and related administrative matters relating to devices.

(8) Section 521(a) does not preempt a State or local requirement whose sole purpose is raising revenue or charging fees for services, registration, or regulatory programs.

(9) Section 521(a) does not preempt State or local requirements of the types that have been developed under the Atomic Energy act of 1954 (42 U.S.C.2011 note), as amended, the Radiation Control for Health and Safety Act of 1968 (Pub.L. 90–602 (42 U.S.C. 263b et seq.)) and other Federal statutes, until such time as the Food and Drug Administration issues specific requirements under the Feder-

preemption only where state and federal requirements meet a specified criteria. The MDA does not preempt state claims to the extent that a common law action mirrors the FDA regulations. The MDA does not deny states "the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.* at 2255. The MDA regulations allow for preemption when the "FDA has established 'specific counterpart regulation or . . . other specific requirements applicable to a particular device." *Id.* at 2257. The pleurality opined that "given the critical importance of device-specificity in our (and the FDA's) construction of § 360k, it is apparent that few, if any, common-law duties have been pre-empted by this statute." *Id.* at 2259. In making this determination, Justice Stevens stated that to accept Medtronic's arguments in favor of preemption would to in effect grant complete immunity for design defect liability to an entire industry which requires stringent regulation. The Court noted that the legislative history did not indicate drafters of the legislation feared that the operation of state law claims would frustrate the purposes of the Act, namely consumer protection and innovation.

In sum, the *Lohr* Court found that preemption occurs "where a particular state requirement threatens to interfere with a specific federal interest." *Id.* at 2257.

State requirements must be "with respect to" medical devices and "different from, or in addition to" federal requirements. State requirement must also relate "to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device," and the regulations provide that state requirements of "general applicability" are not pre-empted where they have "the effect of establishing a substantive

requirement for a specific device." Moreover, federal requirements must be "applicable to the device" in question, and according to the regulations, preempt state law only if they are "specific counterpart regulations" or "specific" to a "particular device." The statue and regulations require a careful comparison between the allegedly pre-empting requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations.

*Id.* On this basis, *Lohr* found that the claims were not preempted because of their generality and the generic nature of the federal requirements at issue. The Court also determined that the state claims would not "impede the ability of federal regulators to implement and enforce specific federal requirements." *Id.* at 2258 "[T]hese state requirements, therefore, escape preemption . . . because their generality leaves them outside the category of requirements that § 360k envisioned 'with respect to' specific devices such as pacemakers." *Id.*

Justice Breyer, while provided the deciding vote for the majority, differed with the plurality on this issue of whether any common law cause of action was a "requirement." He agreed with Justice O'Connor's view that a common law duty was a requirement within the context of the MDA as it "require[s] manufacturers to comply with common-law duties." *Id.* at 2262. Justice Breyer agreed that "one can reasonably read the word 'requirement' as including the legal requirements that grow out of the application, in particular circumstances, of a State's tort law." *Id.* at 2259. By way of illustration, the Justice provided an example of a federal regulation which required a 1 inch wire in a hearing aid and a state regulation that required a 2 inch wire for the same device.

al Food, Drug and Cosmetic Act applicable to these types of devices.

(10) Part 820 of this chapter (21 CFR 820) (CGMP requirements) does not preempt rem-

edies created by States or Territories of the United States, the District of Columbia, or the Commonwealth of Puerto Rico.)

21 C.F.R. 808.1 (1996).

In that instance, preemption would occur. Applying that analysis to a state tort action, he reasoned that "insofar as the MDA preempts a state regulation, or other administrative action, it would also pre-empt a similar requirement that takes the form of a standard of care or behavior imposed by a state-law tort action." *Id.* at 2260 (Breyer, J. concurring). Looking to the FDA regulation, the Justice noted that preemption occurred where " 'specific [federal] requirements applicable to a particular device' made 'any existing *divergent* State ... requirements applicable to the device different from or in addition to, the *specific* [federal] requirements.' " *Id.* at 2260–61 (Breyer, J. concurring).

The PMA exception in *Martin v. Telectronics Pacing Systems, Inc.,* 105 F.3d 1090 (6th Cir.1997) *cert. denied,* —— U.S. ——, 118 S.Ct. 850, 139 L.Ed.2d 751 (1998), also involved a Class III device (pacemaker) but one that underwent scrutiny under the IDE process. Following a detailed discussion of the *Lohr* decision, the Circuit noted that the regulations governing the IDE process differed vastly from those regulations applicable to the § 501k process. While the Circuit did not find specific regulations governing Telectronics' device, they did find that the regulations pertaining to such investigational devices to be "device specific." *Id.* at 1097.

The Court determined that the manufacturing defect claim was preempted because the federal regulations governing investigational devices exempted such devices from Good Manufacturing regulations. To allow a state claim to proceed would be contrary to "promot[ion] [of] safety and innovation, the twin aims of the investigational device exemption of the MDA." *Id.* at 1099. In making this determination, the Court questioned whether the state statute was of general applicability, a basis for rejection in *Lohr.*

The Court next examined whether the claim for design defect was preempted by the MDA. While the Court found that the state requirement was not specifically developed with respect to medical devices, it found that the statute was "the kind of requirement that would impede the implementation and enforcement of specific federal requirements," and again would "thwart the goals of safety and innovation." *Id.* Thus, the claim of design defect under the Ohio statute was found to be preempted. This same analysis was applied to the claim of inadequate warning.

With the *Lohr* and *Martin* decisions as a backdrop, the Court now turns to the parties arguments.

## 3. Preemption Analysis

■ Medtronic states that preemption is proper under the first prong of the *Lohr* analysis, which requires the federal requirement to be specific to a particular device. Unlike the device in *Lohr,* the SynchroMed Pump approval was obtained through the rigorous PMA process barring any exemptions. To be sure, other federal courts have determined the PMA process, which requires assurances of safety and effectiveness, to be a specific federal requirement applicable to a device. *See Mitchell v. Collagen,* 126 F.3d 902 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1300, 140 L.Ed.2d 467 (1998); *Martin, supra* (noting no specific regulations which governed the device but that the "application and approval process under the IDE" was *device specific* ). *But see Goodlin v. Medtronic, Inc.,* 167 F.3d 1367 (11th Cir., 1999) (finding that no specific federal requirement was imposed on manufacturer of Class III device through the PMA process).

In opposition, Plaintiff argues that there is no federal requirement specific to this particular device. *See Lakie v. Smith-Kline Beecham,* 965 F.Supp. 49 (D.D.C. 1997); *Comeau v. Heller,* 945 F.Supp. 7 (D.Mass.1996). These cases, however, represent divergent views among the trial courts in the federal system. *See, Lake v. TPLC,* 1 F.Supp.2d 84 (D.Mass.1997)

(where safety is a primary concern, for purposes of MDA's preemption clause, PMA process imposes specific federal requirements, declining to adopt *Lakie* and *Comeau,* thereby adopting the view under *Mitchell* ). As this Circuit found the "application and approval process under IDE is device specific," this Court finds that the same analysis would apply to regulations under the PMA process, with similar results. *Martin* 105 F.3d at 1097.

Plaintiff also charges that the FDA did not subject the SynchroMed Pump to "any rigorous PMA process" and challenges the FDA's approval of the device in light of the failure rate of Defendant's catheters. This argument cannot be considered as it is not the province of this Court nor does Plaintiff present any authority which would justify any review of the FDA's process with respect to this particular device. This Court notes that Judge Beckwith rejected a similar argument in *Kemp v. Medtronic, Inc.,* Case No. C–1–97–103 (S.D.Ohio, Jan. 12 1999)[5].

Plaintiff also argues that a recent proposed amendment to the regulatory provision addressing preemption weighs in favor of her position. The FDA's proposed amendments to 21 C.F.R. § 808.1, as contained in 62 Fed.Reg. 65384, reflects the FDA's general concern that general FDA requirements should not have a broad preemptive effect on state common law remedies and they propose limitations which are more restrictive but would still allow for preemption under certain circumstances. The Texas Supreme Court in *Worthy v. Collagen Corp.,* 967 S.W.2d 360 (Tex.), *cert. denied,* ── U.S. ──, 118 S.Ct. 2372, 141 L.Ed.2d 740 (1998), took

note of the proposed amendments but concluded that the PMA process was sufficiently specific to preempt statutory claims tantamount to negligence, breach of warranty and products liability. *Id.* at 375–76. In addition, the proposed amendments were withdrawn in mid-1998, *see* 63 Fed. Reg. 37,789 (1998), and even the Eleventh Circuit, which disagreed that the PMA is device specific gave the proposed rules no weight. *Goodlin,* 167 F.3d 1375, fn. 15. Accordingly, these withdrawn proposals are likewise entitled to no weight as it pertains to this analysis.

The next step in the analysis is to determine whether the state statute is specific to the device or of a general nature at least with regard to the state claims and the extent to which it meshes with the federal requirement. The Sixth Circuit's decision in *Martin* found that statutory claims which are not specifically applicable to certain devices can, nevertheless, "thwart the goals of safety and innovation" under the federal requirements. *Martin* 105 F.3d at 1099.

Applied to the case at hand, the PMA process critically examines the device from the standpoint of design, manufacture and performance. This process was noted by the Eleventh Circuit as taking a considerable amount of time and entailing significant cost.[6] Medtronic argues that Plaintiff's breach of implied warranty claim under O.R.C. § 1302.27 is preempted by the MDA's PMA process.

The statute protects the user when goods are not of an acceptable quality when compared to that generally acceptable in the trade for goods of like kind. *Price Bros. Co. v. Philadelphia Gear*

**5.** In that case, Plaintiffs alleged that Medtronic perpetrated a fraud upon the FDA by falsifying or misrepresenting test results in relation to its pacemaker lead. The district court noted that the Third Circuit and at least one Ohio appellate court have not allowed the judicial system to second-guess the FDA's enforcement of its policies. *See, Michael v. Shiley, Inc.,* 46 F.3d 1316 (3d Cir.), *cert. denied,* 516 U.S. 815, 116 S.Ct. 67, 133 L.Ed.2d 29

(1995); *Klein v. Biscup,* 109 Ohio App.3d 855, 673 N.E.2d 225 (1996).

**6.** *Lohr v. Medtronic,* 56 F.3d 1335, 1345 n. 14 (11th Cir.1995) *aff'd and rev'd in part,* 518 U.S. 470, 116 S.Ct. 2249, 135 L.Ed.2d 700 (1996), "While the average price-range of market entry through the premarket notification 510k procedure is $50 to $2,000, the equivalent range for devices undergoing the PMA process is $111,000 to $828,000."

*Corp.,* 649 F.2d 416 (6th Cir.), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981). The Court in *Mitchell* stated that "an implied warranty claim is based on the accepted standards of design and manufacture of products." *Mitchell,* 126 F.3d at 915. The PMA process assesses the safety and effectiveness of the device "with respect to the persons for whose use the device is represented or intended." 21 U.S.C. § 360c(a)(1)(2)(A). Therefore, in approving the device, the FDA considers not only the quality of the device but the class of individuals to whom it is intended to benefit. To the extent that the statute challenges the quality of the goods, it imposes requirements different from those of the exacting federal requirements. Therefore, this Court must conclude that the state claim for breach of implied warranty is preempted and Defendant's motion for summary judgment as to this issue is well taken.

## D. Learned Intermediary Doctrine.

■ The learned intermediary doctrine has been adopted by the Ohio Supreme Court and has been applied in product liability actions involving prescription drugs. *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (1981); *Tracy v. Merrell Dow Pharmaceuticals, Inc.,* 58 Ohio St.3d 147, 569 N.E.2d 875 (1991). The doctrine operates as an exception to the manufacturer's duty to warn the ultimate consumer and shields manufacturers from liability where the warning to the prescribing physician is adequate. "The rationale behind these holdings is that the physician stands between the manufacturer and the patient as a learned intermediary. The physician has the duty to know the patient's condition as well as the qualities and characteristics of the drugs or products to be prescribed for the patients's use." *Tracy,* 569 N.E.2d at 878. In other words, the duty to warn is discharged to the physician on the basis of the adequate warnings provided to that physician by the manufacturer.

■ The issue is whether the Defendant provided adequate warnings to the patient's physicians. In this instance, the instructions included with the SynchroMed Infusion System warned of "potential complications" as follows:

A clinical trial was performed to establish the safety and efficacy of the Medtronic SynchroMed Infusion System. Based upon the data collected during this clinical trial, the potential complications associated with the use of this device may include, but may not be limited to, the following: Cessation of therapy due to battery depletion or random component failure; pocket seroma, hematoma, erosion, or infection; catheter angulation; catheter occlusion; catheter dislodgement; catheter break; hygroma; and lumbar puncture-type headache.

(Mueller Aff., Ex. G.) In addition, a disclaimer of warranties accompanied this system and addressed Defendant's intraspinal catheter accordingly:

Medtronic SynchroMed Intraspinal Catheters (Catheters) are implanted in the extremely hostile environment of the human body. Catheters may fail to function for a variety of causes, including but not limited to medical complications or failure of Catheters by complete or partial occlusion; breakage; dislodgment; or connector separation. In addition, despite the exercise of all due care in design, component selection, manufacture and testing prior to sale, Catheters may be easily damaged before, during, or after insertion by improper handling or other intervening acts. Consequently, no representation or warranty is made out that failure or cessation of function of Catheters will not occur, that the body will not act adversely to the implantation of catheters, or that medical complications will not follow the implementation of catheters.

(*Id.*) The Defendant, through Mr. Mueller's affidavit, asserts that these instructions accompanied Mr. Dunlap's Medtron-

ic's device. Plaintiff does not dispute that these warnings were provided to Drs. Hess and Teitlebaum, but argues that that this theory does not negate a defective manufacturing claim. While this is correct, Defendant relies upon this proposition with regard to the claims of *inadequate warning*. As the evidence clearly demonstrates that Drs. Hess and Teitlebaum were the physicians who recommended implantation of the device, and were provided with the appropriate warnings, the physicians were provided with the necessary information and are considered learned intermediaries. On this basis, Defendant is granted summary judgment as to Plaintiff's warning claims.

**E. Lack of Evidence to Support Claims.**

■ Assuming *arguendo* that Plaintiff's claims remain viable, Medtronic states that there is insufficient evidence upon which summary judgment can be denied as to the product liability claims. The elements necessary for a product liability action in Ohio require proof that (1) there was a defect in the product manufactured and sold by the defendant; (2) that such a defect existed at the time the product left the hands of the defendants; and (3) that the defect was the direct and proximate cause of plaintiff's injuries. *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 37 Ohio St.3d 1, 5, 523 N.E.2d 489, 493 (1988) (citations omitted).

■ The affidavit of Dr. Teitlebaum has previously been discounted by the Court as it contradicts, without explanation, his statements on this issue in his previous deposition. Dr. Smith's affidavit, however, may be considered in support of these claims. Dr. Smith simply concludes "to a reasonable medical probability, that from June 10, 1994 until Mr. Dunlap's

death on January 22, 1996, the Medtronic pump and/or catheters failed to relieve Mr. Dunlap's pain and suffering." (Smith Aff., ¶ 4.) It is unclear whether this "failure" was due to a defect in the device or to Mr. Dunlap's increasing tolerance (relating to effectiveness) of the drugs being infused through the system. (Teitlebaum Dep., p. 120.) This conclusional averment does not rise to the level necessary to raise a genuine issue of material fact because it does not address or provide evidence of the relevant elements necessary to survive Medtronic's motion for summary judgment as to the product liability claims. Accordingly, Defendant's motion for summary judgment on this basis is granted.

**III. CONCLUSION**

For the reasons stated above, Defendant's motions[7] for summary judgment (Doc. Nos. 23 and 24) are granted.

IT IS SO ORDERED.

7. Counsel for Defendant filed two identical motions for summary judgment. The first motion was filed on July 27, 1998 pursuant to the Court granting Medtronic's motion for leave to exceed the page limitation and for leave to file the motion *instanter*. According to Medtronic's counsel, the second motion for summary judgment was filed on August 3, 1998, in accordance with that July 27, 1998 Order presumably as counsel was unaware that the Court filed Defendant's motion that same day. As the docket reflects two separate but identical motions, for administrative purposes, the Court grants both motions.