**Barbara J. SKERL, et al., Plaintiffs**

v.

**ARROW INTERNATIONAL, INC., Defendant**

**No. 1:99CV2832.**

United States District Court, N.D. Ohio, Eastern Division.

Oct. 29, 2001.

Paul M. Kaufman, Cleveland, OH, for Plaintiffs.

Eric Larson Zalud, Robert C. Psaropoulos, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for Defendant.

## MEMORANDUM OPINION

PERELMAN, United States Magistrate Judge.

Now before this Court is the motion of defendant Arrow International, Inc. ("Arrow") for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

This action was initiated by plaintiffs Barbara J. Skerl and her husband, Bernard M. Skerl, in the Cuyahoga County Common Pleas Court, and removed by defendant to this federal court on November 19, 1999 pursuant to 28 U.S.C. §§ 1332 and 1446 based upon diversity of citizenship. Plaintiffs are Ohio residents and Arrow is a corporation organized and existing under the laws of Pennsylvania.

In their amended complaint plaintiffs allege that defendant "designed, produced, created, made, manufactured, constructed and/or assembled" a defective product known as a "Constant Flow Implantable Pump" ("Pump") bearing serial number 3955 which had been implanted into Barbara Skerl and caused her serious harm. Plaintiffs further allege that defendant failed "to provide adequate warnings, instructions, training and/or set-up" regarding the alleged defective product, which also resulted in injuries to the plaintiffs. Mr. Skerl alleges injury by reason of loss of the consortium of his wife.

Mrs. Skerl suffered a long history of chronic back, leg and hip pain, which caused her to undergo a number of surgeries including cervical disc surgery, carpel tunnel surgery, arthroscopic surgery of the right knee, rotator cuff surgery, hip replacement surgery with subsequent revision and several lumbar surgeries, including multiple discectomies, laminectomies and spinal fusions. She also dislocated her hip twice during a three month period.

As a result of plaintiff's chronic pain, Dr. Vinod Joshi, one of plaintiff's treating physicians, recommended that she have a morphine pump surgically implanted into her body.

On October 29, 1998 Dr. Louis Keppler implanted the Pump into plaintiff, at the lower left quadrant of her abdomen, between her ribs and the iliac crest. The Pump is a drug delivery system completely implanted beneath the skin, which provided a continuous flow of medication up to its reservoir capacity of 30cc.

Upon being sent to Dr. Keppler the Pump included the following instructions and warnings:

**Arrow Model 300 Series Constant Flow Implantable Infusion Pumps**

**Contraindications**

The Arrow Model 3000 Series Constant Flow Pumps with Bolus Safety Valve are contraindicated for use in patients with:

1. Known or suspected infection, bacteremia, septicemia or peritonitis.

2. Known to have experienced an allergic reaction or other signs of intolerance to implanted devices.

3. Emotional or psychiatric problems.

4. Patients whose body size is insufficient to accommodate the physical size of the Pump.

5. FUdR should be used with added caution in patients with impaired hepatic or renal function.

6. Patients with known disease extending beyond an area capable of infusion should be considered for systemic therapy with other chemotherapeutic agents.

Contraindications relating to the specific drug to be used should be observed and followed per the approved drug labeling.

**Adverse Effects**

Possible adverse effects of the Pump are *those potential risks associated with any implanted drug delivery device and include: catheter thrombosis [blockage], bolus path occlusion [blockage], vessel thrombosis [blockage], Pump dislodgement, seroma, or recurrent hematoma, infection, extravasation, catheter shear, dislodgement or leakage, and migration.* Drug extravasation may result if the instructions for use are not followed correctly during a Pump refill or bolus procedure (see the Instructions for Use pamphlet). It is important that an Arrow Refill Kit (Cat.# AP–07001) be utilized for Pump refill and that the refill procedure be carried out in accordance with the instructions provided in the pamphlet and in the Refill Kit. An Arrow Special Bolus Needle (Cat.# AP–04013) must be utilized to successfully perform a bolus procedure.

(Emphasis added.)

Mrs. Skerl testified upon deposition that she received the aforementioned information regarding the Pump and that both Drs. Keppler and Joshi reviewed the information with her. She also signed a consent form prior to the surgery indicating that she had been informed of the procedure and its risks, as well as potential problems related to recuperation.

After the surgery plaintiff made arrangements to return to Dr. Joshi to have the Pump filled as needed. Dr. Joshi subsequently saw plaintiff on November 23 and December 23, 1998, each time refilling the Pump to its capacity of 30 cc of morphine, although the infused volumes (amounts released into Mrs. Skerl since the prior visits) were only 20 cc and 11 cc, respectively.

On February 15, 1999 Mrs. Skerl once again returned to Dr. Joshi, this time complaining that the Pump was not alleviating her pain. Dr. Joshi extracted the entire 30 cc of morphine remaining in the Pump and did not refill the Pump. Instead, he gave Mrs. Skerl a bolus injection of 2cc of morphine, using the Pump as a conduit to do so by injecting the morphine into the catheter connected to the Pump which in turn allowed the medication to pass into her system.

Mrs. Skerl then left the office of Dr. Joshi, returned home, made dinner and went to bed at about 9:00 that evening. She stated during her deposition testimony that she remembers nothing more about that night, but does recall waking in the morning and finding herself in the intensive care unit of Parma Hospital. She also testified that upon going to bed that evening she may have been under the influence of Percocet, Prozac, Fioricet, Desyrel, Nolvadex, Librax, Tamoxifen, Percodan, Corgard, Paxil, and Azulfidine.[1]

Mr. Skerl testified upon deposition that after sleeping on the living room couch he was awakened at about 8:00 the next morning by the sound of his wife calling

---

1. Plaintiff was under prescription for chlordiazepoxide/librax, nolvadex, desyrel, sulfasalazine, corgard, paxil, fioricet, percocet, biotin, and caltrate.

him. He went to her bedroom, found her lying on the floor between the night stand and the bed, and then called 9–1–1.

The Parma Fire Department responded and took Mrs. Skerl to Parma Hospital, where she underwent a closed reduction of a dislocated right hip and was treated with medication to prevent blood clots. She was also administered a charcoal absorption drink to soak up and neutralize the oral medications in her stomach.

During deposition questioning by plaintiffs' counsel Mr. Skerl opined:

Q. What do you think happened, then?

A. What do I think happened?

MR. KAUFMAN: When?

Q. To cause -

A. What happened that night?

Q. Yeah.

A. I think– I think the pump malfunctioned and the Morphine went up into her brain.

Q. From the pump?

A. Yep.

Q. Okay.

A. That's exactly how I think what happened.

On November 16, 1999 Dr. Keppler removed the Pump, leaving inside Mrs. Skerl a catheter which had been attached to the Pump near her spine during the initial implantation. Dr. Keppler later explained to Mrs. Skerl that because of the location of the catheter it would be dangerous to remove it, and that patients live many years with such a catheter inside them without problems.

After removing the Pump Dr. Keppler examined it and summarized his findings in his affidavit as follows:

On October 29, 1998, at Lutheran Medical Center, I inserted the Arrow Constant Flow Implantable PumpSerial No. 3955 ("Pump") in Mrs. Skerl. The pump was to be used to manage and control Mrs. Skerl's intractable back and leg pain, by a medication delivery system. The medication used in Mrs. Skerl's pain management was morphine. Mrs. Skerl has a history of chronic and intractable lumbar and leg pain, associated with degenerative disc disease, multiple back surgeries and lumbar blocks. She suffers from marked obesity, hypertension, osteoarthritis of the right hip, with hip replacement and dislocations, inflammatory bowel disease, torn right rotator cuff with arthroscopy and repair, chondromylacia of the knee with laser chondroplasty and status post lumpectomy with radiation.

On November 16, 1999 at Lutheran Medical Center, I removed the pump from Mrs. Skerl. At the request of Paul Kaufman, Esquire, Mrs. Skerl's attorney, I performed testing as to the pump's functionality. My testing revealed that the pump was functioning properly and operating at the expected rate of flow. I did not prepare any written report on my findings from my testing of the pump. I did report my findings to Paul Kaufman, Esquire. It is my opinion, the pump could not have caused Mrs. Skerl to receive an overdose of morphine because the pump was functioning properly and was not capable to exceeding its normal rate of flow.

After Dr. Keppler's examination of the Pump it was then sent, by agreement of counsel, to Arrow's Walpole, Massachusetts manufacturing facility for further testing. Ms. Ann Jackson, Return Product Analyst Specialist for Arrow, examined the Pump over the course of five days of testing and concluded as follows, as summarized in her affidavit:

On July 28, 2000, I tested the constant flow implantable pump, Serial No. 3955 (the "Pump"). It is my understanding that previous testing was performed by

a physician on an unknown date following explant of the Pump and prior to delivery to Arrow in Reading, Pennsylvania. During that time, the Pump was subject to uncontrolled environmental variables that may have affected the condition of the Pump. My testing revealed that once flow was initiated this Pump flowed per manufactured specifications.... In my opinion as a returned product analyst, I do not believe that the Pump could emit morphine at any rate greater than the normal rate of flow of 0.54 mls/day.

Ms. Jackson testified upon deposition that in her eleven years of experience as a returned product analyst these pumps "don't fail," but are impacted by either catheter occlusions or "air in the capillary due to handling processes." In this case she could only examine seven and a half inches of the catheter which had been attached to the Pump implanted in Mrs. Skerl, as about ten and a half inches of that eighteen inch catheter remained in her body, and found no problem with the portion of the catheter that she examined.

Arrow claims entitlement to summary judgment as a matter of law for each of the following reasons: (1) plaintiffs cannot establish that the pump was defective; (2) there is no evidence of a failure to warn; and (3) there is no evidence that the pump proximately caused Mrs. Skerl's injuries.

The plaintiffs counter that summary judgment must be denied as a matter of law in light of factual issues raised by the deposition testimony of Ms. Ann Jackson, who performed testing upon the pump removed from Mrs. Skerl; by the affidavits of Dr. Vinod Joshi and Mr. Michael D. Leshner, and by the deposition testimony of the plaintiffs.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is the court's function under such a motion to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. *Tee–Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974); 6 *Moore's Federal Practice* 56.15 [1.–0].

It is the initial burden of the moving party to demonstrate the absence of a genuine issue of material fact as to an essential element of the claims brought by the non-moving party. *Curto v. Harper Woods,* 954 F.2d 1237, 1241 (6th Cir.1992); *Wilson v. Zanesville,* 954 F.2d 349, 350–351 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989).

In *Street v. J.C. Bradford & Co., supra,* the Sixth Circuit Court of Appeals reviewed three then recent decisions of the United States Supreme Court addressing summary judgment practice, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[2] The court summarized those cases as standing for a number of new principles in summary judgment practice, including the fact that cases involving considerations of state of mind is-

**2.** After the passage of a number of years the court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true, but the characteriza- tion of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

sues (such as discriminatory action) are not automatically inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving party must provide "more than a mere scintilla of evidence" to avoid summary judgment; that the substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". *Id.* at 1479–1480 (Footnotes and citations omitted.)

■ A plaintiff in either a negligence or products liability failure to warn case must show that a duty was owed by defendant to plaintiff. Under Ohio law the duty owed is the same under either theory. *Crislip v. TCH Liquidating Co.,* 52 Ohio St.3d 251, 252, 556 N.E.2d 1177, syllabus at paragraph 3 (1990), *Hanlon v. Lane,* 98 Ohio App.3d 148, 153, 648 N.E.2d 26 (1994). Whether Arrow had a duty to warn under these circumstances is a question of law and, therefore, cannot be a material issue of triable fact. *Schaffer v. A.O. Smith Harvestore Products, Inc.,* 74 F.3d 722, 729 (6th Cir.1996) (interpreting Ohio law) (citing *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 269 (1989)).

■ Where, as in the present case, the manufacturer of an implantable medical device provides adequate warnings to the prescribing physicians regarding potential risks associated with the device the "learned intermediary doctrine" operates as an exception to the manufacturer's duty to warn the ultimate consumer of the product. *Dunlap v. Medtronic, Inc.,* 47 F.Supp.2d 888, 897–98 (N.D.Ohio 1999). As District Judge David A. Katz explained:

> The learned intermediary doctrine has been adopted by the Ohio Supreme Court and has been applied in product liability actions involving prescription drugs. *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (1981); *Tracy v. Merrell Dow Pharmaceuticals, Inc.,* 58 Ohio St.3d 147, 569 N.E.2d 875 (1991). The doctrine operates as an exception to the manufacturer's duty to warn the ultimate consumer and shields manufacturers from liability where the warning to the prescribing physician is adequate. "The rationale behind these holdings is that the physician stands between the manufacturer and the patient as a learned intermediary. The physician has the duty to know the patents's condition as well as the qualities and characteristics of the drugs or products to be prescribed for the patient's use." *Tracy,* 569 N.E.2d at 878. In other words, the duty to warn is discharged to the physician on the basis of the adequate warnings provided to that physician by the manufacturer.

*Ibid.*

In *Dunlap* Judge Katz held that the following warnings to the patient's physicians regarding potential complications of an implantable pump and spinal catheter for relief of chronic pain, along with a disclaimer of warranties, were adequate to warrant summary judgment to the defendant on a plaintiff's failure to warn claim:

[T]he potential complications associated with the use of this device may include, but may not be limited to, the following: Cessation of therapy due to battery depletion or random component failure; pocket seroma, hematoma, erosion, or infection; catheter angulation; catheter occlusion; catheter dislodgment; catheter break; hygroma; and lumbar puncture-type headache.

\* \* \* \* \* \*

Metronic SynchroMed Intraspinal Catheters (Catheters) are implanted in the extremely hostile environment of the human body. Catheters may fail to function for a variety of causes, including but not limited to medical complications or failure of Catheters by complete or partial occlusion; breakage; dislodgment; or connector separation. In addition, despite the exercise of all due care in design, component selection, manufacture and testing prior to sale, Catheters may be easily damaged before, during or after insertion by improper handling or other intervening acts. Consequently, no representation or warranty is made out that failure or cessation of function of Catheters will not occur, that the body will not act adversely to the implantation of catheters, or that medical complications will not follow the implementation of catheters.

*Ibid.*

Turning to the present case, it follows that the learned intermediary doctrine applies, so that there was a duty to warn Mrs. Skerl's physicians, rather than Mrs. Skerl, of any potential problems associated with the Pump.

█ The evidence of record is clear that Arrow provided information to both the treating physicians regarding the Pump, and Mrs. Skerl acknowledged reviewed that information with her physicians. Those materials informed a potential recipient of the possibilities of "catheter thrombosis [blockage], bolus path occlusion [blockage], vessel thrombosis [blockage], Pump dislodgement, seroma, or recurrent hematoma, infection, extravasation, catheter shear, dislodgement or leakage, and migration." The defendant having so informed plaintiff and her physicians, plaintiff's claim based upon of failure to warn cannot succeed.

Next defendant asserts that there is no genuine issue of material fact as to whether there was a defect in the Pump and/or whether any such defect could be considered to be the proximate cause of Mrs. Skerl's injuries.

█ In a products liability (or negligence) case brought under the law of Ohio, a plaintiff must prove that there was a defect in a product, in this case the Pump, which existed at the time it left the possession of the manufacturer, in this case Arrow, and that such defect was a proximate cause of the injuries sustained by virtue of the use of the defective product. R.C. § 2307.73(A)(2); *Hester v. Dwivedi*, 89 Ohio St.3d 575, 578, 733 N.E.2d 1161 (2000); *Hunt v. Marksman Products, Inc.*, 101 Ohio App.3d 760, 762, 656 N.E.2d 726 (1995). Failure to establish any of the foregoing elements precludes recovery.

In the present case Dr. Keppler and Ms. Jackson each testified that there were no defects in the Pump. These were the only two witnesses to have examined and conducted testing upon the Pump, with Ms. Jackson having conducted five days of testing. Ms. Jackson also testified that there were no defects in that portion of the catheter which had been removed from Mrs. Skerl's body.

Plaintiffs attempt to counter the foregoing with an affidavit of Dr. Joshi, in which he states that upon determining on February 5, 1999 that the full reservoir capacity of 30 cc of morphine remained in the Pump despite the fact that 55 days had passed

since he had last checked plaintiff, he decided to perform a fluoroscopy. He described the procedure as follows:

12. Injection of radio opaque dye via the pump did not enter the spinal canal. There was no dissipation of dye around the pump either. The dye in the syringe was tested under fluoroscopy to make sure it was not a bad batch.

13. My diagnosis, at that time, was malfunctioning of the Arrow pump. I advised Barbara that the pump might have to be explanted.

Dr. Joshi's statements regarding the malfunctioning of the Pump are premised upon observations made while the Pump was still implanted in Mrs. Skerl, without his having conducted testing on the Pump after it had been explanted. His conclusion that the Pump was not functioning properly merely raises a temporal doubt as to a possible defect, as opposed to sufficient proof of an actual defect based upon observation/testing of the Pump.

Plaintiffs also offer an affidavit from Mr. Michael D. Leshner, a professional engineer who reviewed documents but who had no contact with either the Pump or Mrs. Skerl, in which he opines that "Barbara Skerl experienced a malfunction of the Arrow International product implanted in her body, and that the responsibility for that malfunction lies with the manufacturer, Arrow International." Once again, this witness offers no evidence of an actual defect based upon observation/testing of the Pump and without any contact with Mrs. Skerl. Consequently, his opinion does not provide sufficient evidence of a defect. *See, Smelser v. Norfolk Southern Railway Co.,* 105 F.3d 299, 303 (6th Cir.1997), *cert. denied,* 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997) (abrogated on other grounds); *Wooley v. Smith & Nephew Richards, Inc.,* 67 F.Supp.2d 703, 708 (S.D.Tex.1999); *Baker v. Danek*

*Medical, Inc.,* 35 F.Supp.2d 865 (N.D.Fla. 1998); *Hensley v. Danek Medical, Inc.,* 32 F.Supp.2d 345 (W.D.N.C.1998); *Smith v. Sofamor,* 21 F.Supp.2d 918 (W.D.Wis. 1998).

As regards plaintiffs' claims of defect in that portion of the catheter which remains in Mrs. Skerl's body, aside from the fact that nobody has conducted testing upon the catheter to determine whether it was defective, there is evidence from Dr. Joshi that it was a teflon catheter. In an affidavit of Ms. Jackson states that the Pump is manufactured with a silicone catheter attached to it and that Arrow does not manufacture teflon catheters. Therefore, even if there had been evidence that such catheter was defective any defect in the catheter remaining inside Mrs. Skerl could not be associated with defendant.

In this Court's opinion the foregoing evidence fails to establish a genuine issue of material fact as to whether the Pump was defective, so that defendant would be entitled to summary judgment solely based on this issue.

However, if there was a genuine issue as to a defect in the Pump this Court believes that there is a fatal flaw in the proof offered to establish that the Pump was the proximate cause of Mrs. Skerl's injuries.

Whether proximate cause exists is a legal question which considers whether a defendant may be held responsible for an injury. *Hunt v. Marksman Products, Inc.,* at 762, 656 N.E.2d 726, citing 264 *Prosser & Keeton, Law of Torts,* Section 42 (5th Ed.1984). Proximate cause: " 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.' " *Ibid,* citing *Jeffers v.*

*Olexo,* 43 Ohio St.3d 140, 143, 539 N.E.2d 614, 617 (1989). Stated differently by the Ohio Supreme Court, proximate cause is "that which in a natural and continued sequence contributes to produce the result, without which it would not have happened." *Piqua v. Morris,* 98 Ohio St. 42, 120 N.E. 300 (1918), cited in *Kemerer v. Antwerp Board of Education,* 105 Ohio App.3d 792, 796, 664 N.E.2d 1380 (1995).

"[M]ere coexistence of negligence and injury" is not sufficient to demonstrate probable cause. *Flamm v. Coney Island Co.,* 49 Ohio App. 122, 195 N.E. 401 (1934). To the contrary, a remote cause for which no liability will lie has been defined as "an injury that could not have been foreseen or reasonably anticipated as the probable result of an act of negligence." *Armour & Co. v. Ott,* 117 Ohio St. 252, 257, 158 N.E. 189 (1927), cited in *Kemerer v. Antwerp Board of Education, supra.*

In *Kemerer* the plaintiff sought to recover damages against a school board for negligence which he claimed caused him to be diagnosed with terminal lung cancer. He alleged that the negligence of the school district in setting up the gymnasium for an event at which he would be videotaping on behalf of the school caused his serious ankle injury which, in turn, prevented him from seeking follow-up care for lung surgery he had undergone six months earlier, which appointment would have shown him to have developed lung cancer. The trial court granted summary judgment on the basis that the nexus between the plaintiff's fall and his diagnosis of terminal lung cancer was too remote to constitute proximate cause.

In this case Mrs. Skerl claims that a defect in the Pump caused her pain to continue which, in turn, caused her to visit Dr. Joshi, who then drained the Pump, injected her with morphine, prescribed additional painkillers and sent her home, which then somehow caused her to fall out of bed and sustain a broken hip. She seeks to impose liability upon defendant on the theory that an alleged defect in the Pump caused her injuries from the fall.

Plaintiffs rely on a statement of Dr. Joshi that "improper functioning or malfunctioning of the pump ***probably contributed*** to the injuries suffered by Barbara Skerl" (emphasis added) as evidencing proximate cause. It is plain that in so stating, Dr. Joshi recognizes the tenuous nature of his findings as they relate to causation when he states that malfunctioning of the Pump "probably contributed" to plaintiff's injuries.

As regards plaintiffs' contention that Mr. Leshner provides evidence of causation, this Court has reviewed his affidavit and has found that Mr. Leshner merely states that he believes there to have been a "malfunction," for which Arrow International is responsible, but he offers no opinion as to whether such "malfunction" bore any relation to plaintiff's injuries.

Cogent evidence bearing upon causation can be found in the deposition testimony of Dr. Gregory G. Hickey, the physician who treated Mrs. Skerl on the evening of her fall, in which he stated he believed that the combination of drugs she had ingested "would be more responsible for [her fall] than certainly any issue with the [empty] pump." The emergency room records indicated that Mrs. Skerl seemed to have been unable to hear when she was brought in by ambulance, and that she had been lethargic. The drug screening Dr. Hickey ordered indicated that plaintiff had ingested many drugs including Librax, Nolvadex, Desyrel, Sulfasalazine, Corgard, Paxil, Fioricet, Percodan, [multivitamin], Vitamin F, Biotin and Caltrate. Those drugs, in combination with the fact that she was on morphine for pain, caused Dr. Hickey to issue a verbal order to administer charcoal to absorb the drugs in Mrs.

Skerl's digestive system and to subsequently conclude:

> I said, This is a very high risk profile. I would not recommend or support, especially with this event, you know, this polypharmacy program because of– and it says, Recommend pain clinic, is meaning that in reflection of the events that happened on this presentation with the, you know, drugs listed and discussed above, that again with narcotics and barbiturates and antidepressants, all of which can, alone or in combination, have ill effects, I wouldn't support their continuation from here.
>
> \*     \*     \*     \*     \*     \*
>
> That would be, I feel, a very dangerous combination to continue. And if one does, you have to have that understanding, but sometimes it's done. But in view of the fact that she had this event, I thought she ought to take extreme caution.

Dr. Hickey testified further that he contacted Dr. Joshi and expressed his concerns with the drug regimen, most importantly the fact that more than one physician was prescribing these powerful drugs to Mrs. Skerl. It was Dr. Hickey's belief that Mrs. Skerl should "scale back and eliminate the Librax."

■ Based upon the foregoing evidence, this Court is of the opinion that this case is analogous to *Kemerer* and, as in *Kemerer*, that there is no genuine issue of material fact pertaining to whether the injury sustained by Mrs. Skerl was the natural and probable consequence of any problem with the Pump.

Summary judgment dismissing plaintiffs' complaint will be entered in defendant's favor.